KNIGHTS OF EQUITY MEMORIAL SCHOLARSHIPS COMMISSION *v.* UNIVERSITY OF DETROIT.

1. EVIDENCE—JUDICIAL NOTICE—VALUE OF THE DOLLAR.

The courts take judicial notice of the shrinkage of the value of the dollar during a period of some 3 decades, and of the hardships visited upon the recipients of fixed incomes, and of the adjustments necessary to be made in their affairs.

2. TRUSTS—CREATION—EVIDENCE.

Evidence as to circumstances surrounding execution of agreement, establishing 24 scholarships at university in return for conveyance of property to it, was properly received and considered by the trial court in determining whether or not a trust had been intended, where the terms "trust" or "trustee" were not used in the instrument, the rule of partial integration being applicable.

3. SAME—INTENT—EVIDENCE.

The terms "trust" and "trustee" are neither necessary to the creation of a trust, nor conclusive with respect thereto even if used, but their omission does require a most complete review of the surrounding circumstances in order to determine whether or not a trust has been intended.

---

REFERENCES FOR POINTS IN HEADNOTES

[1] 20 Am Jur, Evidence § 65.
[2] 54 Am Jur, Trusts § 609.
[3] 54 Am Jur, Trusts § 40.
[4] 10 Am Jur, Charities § 9.
[5] 10 Am Jur, Charities § 13.
[6, 7] 10 Am Jur, Charities § 11.
[8] 10 Am Jur, Charities § 133.

4. Same—Charitable Trust—Intention—Evidence.

A charitable trust is created only if the settlor properly manifests an intention to create it, it being unnecessary to use any particular language to show such intention as long as it shows an intention that the property should be held subject to a legal obligation to devote it to purposes which are charitable.

5. Same—"Charitable" Trust—Purpose.

It is the purpose to which the property is to be devoted which determines whether the trust is charitable, not the motives of the testator in giving it.

6. Same—Scholarships at University—Charitable Trust.

A charitable trust of property was created by its conveyance to university for establishment of 24 scholarships in perpetuity to appointees of commission created by settlor, since it was intended for the purpose of encouraging education.

7. Same—Construction of Conveyance—Intention.

Instrument of conveyance of the assets of a corporation about to be dissolved whereby grantee university agreed to establish 24 scholarships in perpetuity to appointees of commission created by settlor *held*, under evidence presented, to have created a charitable trust, not merely a contract, in order to effectuate the manifest intent of the creator.

8. Same—Charitable Trust—Cy Pres—Scholarships at University.

*Cy pres* doctrine *held*, applicable to charitable trust created by conveyance of property to university for establishment of 24 scholarships to appointees of settlor's commission, so as to permit university to make charge to such appointees when the net income from the trust is substantially insufficient to carry out the trust purpose in terms of fully-paid scholarships.

9. Costs—Public Question—University Scholarships.

No costs are allowed in suit to construe a conveyance of property to a university for the establishment of scholarships, a matter of public interest being involved.

Appeal from Wayne; Culehan (Miles N.), J. Submitted October 9, 1959. (Docket No. 49, Calendar No. 48,055.) Decided April 11, 1960.

Bill by Knights of Equity Memorial Scholarships Commission, a voluntary association, against the

University of Detroit, a Michigan corporation, for specific performance of agreement in respect to scholarships. Cross bill asking that arrangement be determined as a trust and that *cy pres* doctrine be invoked. Decree for defendant. Plaintiff appeals. Affirmed.

*John V. Moran,* for plaintiff.

*Wurzer, Higgins & Starrs* (*John T. Higgins, John R. Starrs* and *Robert A. Macdonell,* of counsel), for defendant.

SMITH, J. The controlling issue in this case is whether a trust has been created or an ordinary contract executed.

The matter arises thus: The Knights of Equity was an organization devoted to the advancement and welfare of persons of Irish descent. It owned certain property in the city of Detroit. In 1924, the corporation ("the old Knights of Equity corporation") was being dissolved. It had no further use for its property. Various dispositions thereof were considered (including sale and pro rata distribution of the proceeds to the then members) but all, save one, were rejected. That is the one before us. It was decided to establish certain scholarships, as hereinafter set forth in detail. In so doing it felt that the works of the "Knights of Equity would live forever," a fitting memorial to this unselfish and praiseworthy organization. Accordingly, an agreement was entered into. The corporation conveyed certain property to the University of Detroit. The university, in turn, agreed in part as follows:

"2. Said university grants to the society 24 scholarships in perpetuity in its high school and collegiate departments and a commission has been created by the society with power from it to per-

petuate itself. * * * This commission shall in perpetuity assign and distribute said scholarships.

"3. In respect to said scholarships, it is understood:

"A. That if in the future the high school of said university becomes a free institution, the scholarships existing therein will be changed to scholarships in one of its collegiate departments.

"B. That any young man taking up the engineering course, which is 5 years, will be allowed to finish his course on the scholarship given him, although in the fifth year another beneficiary may be entered on the same scholarship.

"C. That said commission will not ask the university to retain upon its rolls any student who renders herself or himself subject to dismissal for a breach of any rule or regulation of said university or for lack of proper scholarship, or for any conduct unbecoming a student."

Other clauses provided that masses for the deceased members of the Knights of Equity would be offered annually and that a university building would be named in their honor.

Trouble has now arisen. We, as well as the trial chancellor, take judicial notice of the shrinkage in the value of the dollar, of the hardships visited upon the recipients of fixed incomes, of the adjustments necessary to be made in their affairs. In short that the suit must be cut to fit the cloth. The university decided that, with the academic semester commencing in February, 1956, it would require payment of tuition, in part, to make up the difference between the net income it derived from the property and the amount the scholarships represented. Thus in 1955, the net income had been $6,225.76, and the tuition charges allocable to the scholarships, $8,222.34. Each year, in fact, that the scholarships were granted, the net income proved insufficient to support them, but the deficits were met by the university

from the regular university fund. This, it felt, it could no longer continue to do, what with rising costs across the entire scale of university activities. It contended that the intention of the parties in the agreement was not to impose a financial burden upon the school. The scholarships commission (set up by the agreement, *supra*) countered by bringing the present action. Its contention was that the university had entered upon an enforceable contract to furnish tuition annually, and without additional charge, to 24 students to be nominated by the commission, regardless of what the cost so to do might run. The university's reply, in part, was that the parties had intended to, and had, set up a trust, that it was obligated to manage the property as a trust and, it further urged, that if the net income was not sufficient fully to defray the cost of the scholarships, under the *cy pres* doctrine it was justified in applying the trust income, so far as it would go, towards the scholarships, and in billing the appointees of the plaintiff, proportionately, for the balance. It was argued, in addition, that if this were to be held an ordinary contract, the doctrine of commercial frustration would apply to it.

The decision of the chancellor below was that the property was held in trust, that there had been a general intention to devote the property to charitable purposes, that changes in economic conditions had made it impracticable to enforce the terms of the trust as originally framed, which the chancellor found, contemplated fully-paid scholarships, and hence it should be altered, by application of the doctrine of *cy pres,* so as to relieve the university from the financial drain imposed at this time by the costs of such scholarships paid in full. He concluded that the trust funds should be applied as a "tuition credit" only.

In arriving at this conclusion the trial chancellor received evidence as to the circumstances surrounding the execution of the agreement. This evidence was taken for the purpose of establishing the intention of the parties with respect to the controverted matter of the creation of a trust. Objection made on the ground the instrument was a full and complete integration of the agreement of the parties was properly overruled. The agreement did not contain the words "trust" or "trustee," and although such words are neither necessary to the creation of a trust* nor conclusive with respect thereto even if used, their omission does require a most complete review of the surrounding circumstances in order to determine whether or not a trust has been intended. Here the rule of partial integration applies. *Cf. Stimac* v. *Wissman,* 342 Mich 20.

The evidence revealed that the agreement was, in the words of an original member of the scholarships commission, "the memorialization of a charitable deed." The Knights of Equity, as we noted, had determined in 1924 to dispose of their real property. A committee was appointed to recommend a mode of disposition that would reflect credit on the organization. In all, 10 proposals were considered by the committee. The one that received their approval, and that of the members in general meeting, is outlined in a letter from the president of the University of Detroit:

"May 7, 1924

"Board of Trustees,
Knights of Equity,
Detroit, Michigan.
      "Attention: Chairman Dooley
"*Gentlemen:*
   "It has been brought to my attention that there is some thought of the Knights of Equity transferring

---

* 4 Scott, Trusts (2d ed), § 351.

their real estate to the University of Detroit. I have been told that some question has been raised as to how the University of Detroit might make a fitting memorial in consideration for such a transfer.

"The Board of Trustees of the University of Detroit hereby authorize the execution of a proper agreement, if the following proposition which we respectfully submit is acceptable to your organization:

"1. A memorial mass every year for the deceased members of the Knights of Equity to be sung in the university chapel with a proper address commemorating the services of your organization to the church and the State.

"2. Twenty-four scholarships in perpetuity to be issued by a commission of your own creation to young men, to any department now existing in the university. I would suggest that these scholarships be issued in series of 3, so that each class graduating from the high school or college will have in it 3 of your beneficiaries.

"(a) With this proviso, that in case the University of Detroit High School ever becomes a free institution, the scholarships existing in high school will be changed to scholarships in one of the college departments now existing in the university.

"(b) With a further proviso, that any young men taking up the engineering course, which is 5 years, will be allowed to finish the 5 years on the scholarship, although in that same fifth year another beneficiary is entered on the same scholarship in a college course.

"(c) With this further proviso, that your committee will not expect the university to retain upon its roll any of your beneficiaries, if the same have rendered themselves subject to dismissal either for breaches of discipline or for lack of proper scholarship.

"3. Some building in the group of the new university buildings, to be known as 'Knights of Equity Memorial building.'

"4. That the honor roll as determined by your organization be presented to the university so that the members thereof may be added to the roll of the founders of the Society of Jesus, and shall in perpetuity be remembered in the masses and prayers of the entire order throughout the world and especially of those members of the order who reside at the University of Detroit.

> "Yours very truly,
> "UNIVERSITY OF DETROIT
> "By JOHN P. McNICHOLS, S. J.
> "Its President."

The committee recommended that the scholarships be distributed in the discretion of the commission, preference to be given "to those of Irish blood," but without limitation thereto. It expressed its belief that this proposal would "accomplish good in encouraging sincere and earnest working young men and women so that a direct benefit [would] come from their efforts and inure to the continued success and prosperity of themselves and of our city."

We entertain no doubt, upon this record, that the property was intended to be devoted to charitable purposes. The controlling consideration is well expressed by Scott in these words:

"A charitable trust, like an express private trust, is created only if the settlor properly manifests an intention to create it. The settlor need not, however, use any particular language in showing his intention to create a charitable trust; he need not use the word 'trust' or 'trustee.' It is sufficient if he shows an intention that the property should be held subject to a legal obligation to devote it to purposes which are charitable."*

---

* 4 Scott, Trusts (2d ed), § 351, at p 2574.

And, further:

"It is the purpose to which the property is to be devoted which determines whether the trust is charitable, not the motives of the testator in giving it."[*]

The trust so created was, it is clear, intended for the purpose of encouraging education and of benefiting, ultimately, the people of "our city." We concur in the opinion of the trial chancellor that the trust was established with general charitable intention. The circumstances surrounding the transaction and the expressed intent of the parties, as well as the time of agreement itself, reject any conclusion that this was purely a contract or that it should be so construed. Its purposes were unselfish, praiseworthy, and charitable. It will be construed to effectuate the manifest intent of the creators. We do not regard this canon of construction as debatable and to the degree that such cases as *Alumnae Association* v. *University of Pennsylvania*, 306 Pa 283 (159 Atl 449), and *Hopkins* v. *Women's Medical College of Pennsylvania*, 331 Pa 42 (200 Atl 32), may properly be construed as inconsistent therewith, their reasoning is rejected.

What the situation now boils down to is this: Carrying out the trust in the terms of fully-paid scholarships cannot now be accomplished. To require such on the part of the university must result in a diversion of funds normally available to all students to the beneficiaries of these scholarships. Thus the institution is limited in the accomplishment of its overall objectives by the demands of a few and, should such inflexibility in the use of trust funds become the rule, a curtailment of the facilities otherwise available to all must be the inevitable result. It is to this situation that the *cy pres* doctrine has peculiar applicability. The authority thus to

---

[*] 4 Scott, Trusts (2d ed), § 348, at p 2551.

alter the purposes of a charitable trust *cy pres* when the net income available is not sufficient to make the purposes practicable was recognized by this Court in *Gifford* v. *First National Bank of Menominee,* 285 Mich 58, is applicable to the case at bar, and was properly applied by the trial chancellor. Under the view we have taken of the case it is unnecessary to discuss additional points raised by counsel.

Decree affirmed. No costs, a matter of public interest being involved.

DETHMERS, C. J., and CARR, KELLY, BLACK, EDWARDS, and KAVANAGH, JJ., concurred.

SOURIS, J., took no part in the decision of this case.