WOODBURY v RES-CARE PREMIER, INC

Docket No. 297819. Submitted January 11, 2012, at Lansing. Decided
January 19, 2012, at 9:00 a.m. Leave to appeal granted, 493 Mich
881.

Scott and Jeanne Woodbury and Center Woods, Inc., brought an
action in October 2009 in the Saginaw Circuit Court against
Res-Care Premier, Inc., and Ruth Averill, alleging breach of
certain building and use restrictions regarding property in the
Center Woods Subdivision as a result of Averill's September 2009
sale of her property to Res-Care. Plaintiffs alleged that Averill
violated the provisions requiring the noncommercial use of the
property and that Center Woods be provided the right of first
refusal to purchase the property. Plaintiffs requested a temporary
restraining order, preliminary injunction, and permanent injunc-
tion. Res-Care responded, claiming that Center Woods had waived
the right to enforce the right of first refusal, that Center Woods
had no standing, and that the articles of agreement containing the
restrictions were discriminatory and, therefore, invalid. Center
Woods, which was incorporated as a nonprofit corporation in 1941,
had been automatically dissolved under MCL 450.2922 in 1993
when it failed to file its annual report and pay the annual filing fee
for a second consecutive year. On October 13, 2009, the same day
it filed its action, Center Woods filed renewal-of-existence papers
with the state under MCL 450.2925. The court, William A. Crane,
J., granted a preliminary injunction preventing Res-Care from
occupying the property. The court then granted summary disposi-
tion to plaintiffs and voided the sale between Averill and Res-Care.
Res-Care moved for rehearing, reconsideration, or clarification of
the judgment related to its unaddressed discrimination counter-
claims. The court entered an amended judgment that expressly
stated that the judgment rendered the counterclaims moot and
that judgment was entered without prejudice to Res-Care's right
to renew those claims. Res-Care appealed.

The Court of Appeals held:

1. The provision in the articles of agreement regarding the
right of first refusal required notice of a proposed sale only to
Center Woods, Inc. The trial court erred by holding that Averill

should have provided notice to the other homeowners or a homeowners' association.

2. There is no question that Center Woods, Inc., did not exist at the time of the sale. It is not reasonable to require persons to give notice to a nonexistent corporation on the contingent basis that at some unknown time in the future an unknown person might elect to reinstate the corporation. Simply because someone can reinstate a corporation under MCL 450.2925 does not mean that anyone will, and the law should not require people to assume otherwise. Averill had no obligation to provide notice of the pending sale to Center Woods, Inc., a nonexistent corporation at the time of the sale. The order granting summary disposition to plaintiffs is reversed and the case is remanded to the trial court for the entry of an order granting summary disposition to defendants.

Reversed and remanded.

*Cobert, Shaw, Essad & Tucciarone, P.L.L.C.* (by *Joshua O. Booth*), and *Shinners & Cook, P.C.* (by *Thomas A. Basil, Jr.*), for Scott and Jeanne Woodbury and Center Woods, Inc.

*Miller, Canfield, Paddock and Stone, PLC* (by *LeRoy L. Asher, Jr., Carolyn P. Cary*, and *Joseph G. Vernon*), for Res-Care Premier, Inc.

Before: SAWYER, P.J., and WHITBECK and M. J. KELLY, JJ.

PER CURIAM. In this property action, defendant Res-Care Premier, Inc., appeals as of right the trial court's grant of summary disposition to plaintiffs, Scott and Jeanne Woodbury and Center Woods, Inc., after concluding that Center Woods had the right of first refusal to purchase the property known as #2 Center Woods and that defendant Ruth Averill failed to provide sufficient notice of the sale to Center Woods, as certain building and use restrictions require. The trial court's decision thereby voided the sale between Averill and Res-Care. We reverse and remand.

## I. FACTS

### A. THE PARTIES

Res-Care is a state-licensed operator of adult-foster-care facilities. Its name is short for "Respect and Care," and its mission is "to assist people to reach their highest level of independence." Res-Care provides rehabilitation and residential services to individuals with mental or developmental disabilities.

Defendant Ruth Averill purchased the property commonly known as #2 Center Woods (the property) in 1991 and subsequently sold it to Res-Care on September 25, 2009. That sale is at the heart of this litigation.

Plaintiffs Scott and Jeanne Woodbury are the owners of the property commonly known as #3 Center Woods, which is next door to the property.

Plaintiff Center Woods was incorporated as a nonprofit corporation in 1941. It was automatically dissolved under MCL 450.2922 in 1993 when it failed to file its annual report and failed to pay the annual filing fee for the second consecutive year. On October 13, 2009, the same day this action was filed, Center Woods filed renewal-of-existence papers with the state of Michigan.

### B. THE ARTICLES OF AGREEMENT

In 1941, articles of agreement were entered into by the owners of the properties in the Center Woods Subdivision and filed in the property records. The articles provided, in relevant part, as follows:

> NOW, THEREFORE, IT IS AGREED by and between the parties hereto that all land in Center Woods, a subdivision . . . consisting of Lots One (1) to Twelve (12), inclusive, shall be subject to the following restrictions and covenants:

These covenants are to run with the land and shall be binding on all parties and all persons claiming under them and shall remain in full force and effect until such time as they shall be modified or repealed by agreement entered into by the owners of at least seventy-five per cent (75%) of the lots contained in said plat.

If the parties hereto, or any of them, or their heirs or assigns shall violate, or attempt to violate, any of the covenants herein, it shall be lawful for any other person or persons owning any real property situated in Center Woods Subdivision to prosecute any proceedings at law or in equity against the person or persons violating, or attempting to violate, any such covenant.

Invalidation of any one of these covenants, or any part of any covenant, by judgment or court order shall in no way invalidate any of the other provisions which shall remain in full force and effect.

1. Center Woods shall be maintained as residential property only and no property shall be used for any trade, commercial, industrial, or any other use whether or not herein specified, except for single family dwellings.

\* \* \*

12. All property owners in Center Woods shall be members of Center Woods, Inc., a non-profit corporation, organized to provide for the improvement and maintenance of Center Woods as a desirable residential community.

\* \* \*

15. No property in Center Woods may be sold, assigned, mortgaged or conveyed to or let, leased, rented or occupied by Hewbrews, [sic] or by any persons other than those of the Caucasian (white) race.

16. No property in Center Woods shall be sold without first giving Center Woods, Inc. thirty (30) days notice thereof and first opportunity to purchase said property at a price equal to a bonafide offer.

C. THE TRANSACTION

On July 10, 2009, Averill entered into a contract with Moshen H. Zadeh for the purchase of the property for $170,000. Closing was set for August 15, 2009. Zadeh was an investor of Res-Care. On July 20, 2009, Averill sent a memo addressed to Jack Short, the head of the homeowner's association, and "Center Woods Association," which provided:

> My home is scheduled for "closing" of sale: August 14, 2009[.] And I expect to [be] moving on that date.
>
> Since I have NOT received notification of three previous sales in The Woods . . . I assume this stipulation is no longer necessary.
>
> I do not know the buyer, . . . my realtor is Mary Klein, and the buyer's realtor is Keller Wms (Flint office)[.]
>
> Thank you for all your TLC of The Woods . . . it has been a delightful place to live for eight years.

No one contacted Averill or her realtor regarding the pending sale. Zadeh was unable to obtain financing, so Res-Care decided to purchase the property on its own without Zadeh under the exact same terms as the Zadeh offer. Closing was scheduled to be on or before September 30, 2009, and actually occurred on September 25, 2009.

On October 7, 2009, Averill sent another memo to Short and Center Woods Association, but this time also addressed it to Suzanne Short and the Woodburys. The memo provided, in relevant part:

> Subject: The sale of my home was delayed until September 18th[.] I am scheduled to move Monday, October 12th.
>
> New Owner: ResCare Premier, Inc. . . . .
>
> Local Manager: Laura L. Smith . . . .

> When the identity of the buyers was revealed I talked personally with both Ron Lee and Tim Braun regarding zoning. They told me that "group homes" are exempt from the law and cannot be refused or discriminated from a neighborhood.

> Tim Braun has enacted a Saginaw Township registry of rental homes to keep aware of the percentage of non-owners. I have sent him the names of the people who are responsible for the property and the maximum of six residents, who will have 24[-]hour supervision. They must comply with State mandated safety measures which have been installed.

> During inspection, Laura emphasized that they expect to be "good neighbors", and plan to invite neighbors to an open house when they are settled. Best Wishes.

When Jeanne Woodbury received the letter, she researched Res-Care on the Internet. Concerned that the home would be occupied by "troubled youth/sex offenders," she sent an e-mail to Smith at the address provided in the second notice. Two days later, an "emergent" meeting of the homeowners in Center Woods and a board of directors meeting for Center Woods were held. Averill was not invited. At the meeting, the board was authorized to take steps to prevent "this improper use," and the board authorized Woodbury to be "a committee of one, to meet with" a real estate specialist attorney, with legal action expected to be filed "within a day or two."

On October 12, 2009, the board's counsel sent a letter to Averill claiming that she violated paragraph 16 of the articles of agreement and requesting the details of the transaction "so [Center Woods] may consider exercising its right to purchase the property." The letter also stated:

> This correspondence also confirms that subsequent to your July 20, 2009 correspondence to Jack Short on your

> previous potential sale, which did not ultimately close, you were instructed that the Building and Use Restrictions were still in effect and you were required to provide Center Woods, Inc. formal notice and the terms and conditions of the bonafide offer.

This is apparently a reference to a conversation that Short testified that he had with Averill. According to Short, Averill called him and asked "if she had to do the right of first refusal," and he told her "that if it was me and I was selling my house, I would want to make sure that everything was done properly." Averill testified that this conversation never occurred and that she never spoke with Short.

The following day, on October 13, 2009, plaintiffs filed suit against Res-Care and Averill, alleging two counts of breach of "building and use restrictions," one for the right of first refusal and one for noncommercial use, and requesting a permanent injunction preventing Res-Care from occupying the property. Plaintiffs also requested a temporary restraining order and preliminary injunction. Res-Care filed an answer that included several affirmative defenses, including that Center Woods waived the right to enforce the right of first refusal, that Center Woods's failure to maintain corporate status deprived it of standing, that the articles of agreement were clearly discriminatory and, therefore, invalid under state and federal law, and that Res-Care's use of the property was a valid residential use not in violation of any restrictions, even assuming that they were enforceable.

On November 9, 2009, the trial court held a hearing on the request for a preliminary injunction. Res-Care argued that, although it was a for-profit company, it was providing the home through a contract with the county, which rendered it essentially a not-for-profit entity. In

addition, counsel stated that the residents intending to occupy the property "have no criminal record. They have no history of violence. They have no history of sexually predatory behavior, which is apparently what's, in part, driving this." Counsel also indicated that Res-Care had provided the Woodburys with an opportunity to "sit down and meet and talk" and it had provided some information about the residents without violating their right to privacy. However, the Woodburys elected to get counsel and file suit. Counsel also noted a long history of cases that have held that group homes were not considered a commercial use of residential property.

Ultimately, the trial court granted the preliminary injunction preventing Res-Care from occupying the property. However, the trial court indicated that it would grant an expedited trial. Res-Care then filed counterclaims against plaintiffs, claiming tortious interference with a contract, abuse of process, and violations of the federal Fair Housing Act[1] and Americans with Disabilities Act.[2] Res-Care also objected to the form of the preliminary injunction order.

At the hearing on Res-Care's objections, the trial court indicated that it would set trial for January 5 and that summary disposition motions would be heard on December 21 and had to be filed by December 14. Although it is not entirely clear, it appears that the trial date related solely to plaintiffs' complaint, but there was an indication that the trial court would also consider Res-Care's motion for summary disposition on its counterclaims. An amended preliminary injunction order was entered that also included a scheduling order

---

[1] 42 USC 3601 *et seq.*

[2] 42 USC 12101 *et seq.*

setting forth these dates and reiterating that the trial was to address plaintiffs' complaint only.

Res-Care filed its first motion for summary disposition, alleging plaintiffs' claims failed because the "building and use restrictions" were extinguished under the marketable record title act (MRTA),[3] and because Averill was not required to provide notice to Center Woods because it was a nonexistent entity. Averill then moved for summary disposition, reiterating the MRTA and dissolution arguments from Res-Care, but also arguing that she had complied with the notice requirement. Res-Care filed a second motion for summary disposition, alleging that plaintiffs' claim regarding the right of first refusal failed because the only basis for enforcement was discriminatory and, therefore, unlawful, and that the count regarding commercial use failed because a group home is not considered a commercial use.

Plaintiffs also moved for summary disposition, arguing that Averill and Res-Care both had constructive and actual knowledge of the "building and use restrictions" and that Center Woods had acted within 30 days of when it received notice of the sale. They noted that there were some factual disputes, but contended that none of them prevented summary disposition. They argued that the lack of 30 days' notice and a failure to include a selling price rendered Averill's notice ineffective as a matter of law. They argued that the discriminatory restriction was severable and, therefore, did not automatically render the right of first refusal invalid. Finally, they argued that Center Woods was statutorily deemed to be in existence at the time of the sale and, thus, was entitled to notice.

---

[3] MCL 565.101 *et seq.*

Plaintiffs also filed a combined response to defendants' three motions for summary disposition, reiterating most of the same arguments. However, they provided no evidence or argument to refute Res-Care's allegations that discriminatory intent voided the right to exercise the right of first refusal.

Res-Care filed a response to plaintiffs' motion for summary disposition and argued that the right of first refusal expired for failure to contain a definite time period and that plaintiffs had waived their right to notice because of their. failure to enforce that right. Res-Care also noted that plaintiffs had failed to argue anything regarding the commercial use of the property and contended that plaintiffs had abandoned that argument. The hearing on the parties' motions took place December 22, 2009.

The trial court issued its opinion in February 2010. It began by indicating that it was not addressing any civil-rights claims, but was only addressing the enforceability of the 30-day-notice provision, the propriety of the notice given, and the related issue of Center Woods's corporate status. It concluded that the MRTA did not extinguish the "building and use restrictions" contained in the articles of agreement because they had been sufficiently rerecorded by reference in the deeds found in Averill's chain of title. It concluded that the right of first refusal had not expired and that any determination of a time period for the duration of the right would be arbitrary and capricious and that the only unreasonable time period was that suggested by defendants—the lifetime of the signatories.

The trial court acknowledged that the notice provision had not been enforced, but found that that was not an abandonment of the right, but simply proof that there were times plaintiffs elected not to exercise their

right of enforcement. The trial court concluded that the notice provided by Averill was insufficient because it was not for the sale to Res-Care, but for the proposed sale to Zadeh, and that 30 days' notice was not given. The trial court concluded that Center Woods's status as a corporation did not excuse Averill's failure to give notice, if not to the individual homeowners, then to someone involved with the day-to-day operations of Center Woods.

Finally, the trial court concluded that any discussion of defendants' discrimination claims was premature because the right of first refusal had not yet been exercised and it was possible for plaintiffs to exercise the right in a nondiscriminatory manner. The trial court set aside the sale between Res-Care and Averill and ordered that, if they renewed their agreement, they had to provide 30-days' notice to Center Woods, who would have 30 days from receipt of the notice to exercise its right of first refusal.

On March 8, 2010, the parties attended a hearing regarding outstanding issues in order to obtain a final judgment. One of the issues was whether there was an agreement that the trial court had not decided Res-Care's discrimination counterclaims because they were moot and that they could be "renewed." The trial court entered a judgment for plaintiffs pursuant to its opinion and order the same day, but did not address the counterclaims issue.

Res-Care then moved for rehearing, reconsideration, or clarification of the judgment related to its unaddressed discrimination counterclaims. On April 12, 2010, the trial court entered an amended judgment that expressly stated that the judgment rendered the counterclaims moot and that the judgment was entered

without prejudice to Res-Care's right to renew those claims. Res-Care now appeals.

## II. SUMMARY DISPOSITION

### A. STANDARD OF REVIEW

Res-Care argues that the trial court erred by failing to find that Center Woods's failure to maintain its corporate status prevents it from seeking to enforce the articles of agreement. This Court reviews de novo a trial court's decision on a motion for summary disposition.[4] The facts are considered in the light most favorable to the nonmoving party.[5] This Court reviews the record and the documentary evidence but does not make findings of fact or weigh credibility.[6] This Court also reviews de novo the interpretation of statutes and the proper interpretation of legal instruments, such as deeds or contracts.[7]

### B. CORPORATE STATUS

The facts related to Center Woods's corporate status are not in dispute. It failed to file annual statements and pay annual filing fees in 1992 and 1993, which automatically dissolved the corporation pursuant to MCL 450.2922. In October 2009, Center Woods reinstated itself under MCL 450.2925 before filing the instant litigation. The trial court did not make any determinations regarding the implications of Center Woods's reinstatement. Instead, it concluded:

---

[4] *Driver v Naini*, 490 Mich 239, 246; 802 NW2d 311 (2011).

[5] *Dressel v Ameribank*, 468 Mich 557, 561; 664 NW2d 151 (2003).

[6] *Taylor v Lenawee Co Bd of Co Rd Comm'rs*, 216 Mich App 435, 437; 549 NW2d 80 (1996).

[7] *Driver*, 490 Mich at 246; *In re Rudell Estate*, 286 Mich App 391, 402-403; 780 NW2d 884 (2009).

> Whether or not Center Woods was a corporation in good standing with the State at the time does not, in the view of the court, excuse Mrs. Averill's failure to give notice, if not to the individual residents, certainly to someone involved with the day to day operations of Center Woods. . . . As a practical matter, a right of first refusal is almost always exercised on behalf of an interested homeowner and not the association or corporation.

First, the trial court's determination that Averill ought to have notified someone other than Center Woods is without merit. The articles of agreement is a contract that must be interpreted according to its plain language.[8] "In interpreting a contract, [this Court's] obligation is to determine the intent of the contracting parties."[9] "[A]n unambiguous contractual provision is reflective of the parties' intent as a matter of law."[10] "[I]f the language of a contract is clear and unambiguous, its construction is a question of law for the court."[11]

The articles of agreement provide, "No property in Center Woods shall be sold without first giving Center Woods, Inc. thirty (30) days notice thereof and first opportunity to purchase said property at a price equal to a bonafide offer." The provision requires notice only to "Center Woods, Inc." There is no reference or requirement for notice to homeowners or a generic reference to the homeowners association. Therefore, only Center Woods, Inc., was entitled to notice, and the trial court's conclusion to the contrary was in error.

The next question, then, is whether Center Woods was entitled to notice from Averill. Here, there is no question

---

[8] *In re Rudell Estate*, 286 Mich App at 402-403.

[9] *Quality Prod & Concepts Co v Nagel Precision, Inc*, 469 Mich 362, 375; 666 NW2d 251 (2003).

[10] *Id.*

[11] *Mich Nat'l Bank v Laskowski*, 228 Mich App 710, 714; 580 NW2d 8 (1998).

that Center Woods did not exist at the time of the sale. Center Woods does not dispute that it failed to file its annual reports and pay the required fees, so that it was automatically dissolved under MCL 450.2801(1)(f)[12] and MCL 450.2922(1).[13] "At common law, upon dissolution of a corporation, 'there is no one to serve, because, in law, a dissolved corporation is a dead person, so much so that, in the absence of statute and revival, even pending actions by or against it would abate.' "[14]

Plaintiffs contend that the result of Center Woods's reinstatement pursuant to MCL 450.2925, hours before filing the lawsuit in October 2009, was that the dissolution essentially never took place. Thus, they assert that "Res-Care's conclusion that Mrs. Averill was not required to provide notice to Center-Woods, Inc. is based on a false premise, i.e., that Center Woods, Inc. 'did not exist.' "

Res-Care argues that plaintiffs did not argue the implications of reinstatement before the trial court and that this Court should not consider them here. However, it appears that plaintiffs did argue reinstatement.

---

[12] MCL 450.2801(1)(f) provides:

A corporation may be dissolved in any of the following ways:

*  *  *

(f) Automatically, pursuant to [MCL 450.2922], for failure to file an annual report or pay the annual filing fee or a penalty added to the fee.

[13] MCL 450.2922(1) provides, in part, "If a domestic corporation neglects or refuses for 2 consecutive years to file the annual reports or pay the annual filing fee required by law, the corporation shall be automatically dissolved."

[14] *Gilliam v Hi-Temp Prod, Inc*, 260 Mich App 98, 112; 677 NW2d 856 (2003), quoting *US Truck Co v Pennsylvania Surety Corp*, 259 Mich 422, 426; 243 NW 311 (1932).

But, even if they had not, because statutory interpretation is a question of law, and the effect of the reinstatement statute could result in an affirmance of the trial court's decision on other grounds, this Court will consider the issue.[15]

MCL 450.2925 provides as follows:

> (1) A domestic corporation which has been dissolved pursuant to [MCL 450.2922(1)] . . . may renew its corporate existence . . . by filing the reports for the last 5 years or any lesser number of years in which the reports were not filed and paying the annual filing fees for all the years for which they were not paid . . . . Upon filing the reports and payment of the fees and penalties, the corporate existence . . . is renewed. . . .
>
> (2) Upon compliance with the provisions of this section, *the rights of the corporation shall be the same as through the dissolution or revocation had not taken place,* and all contracts entered into and other rights acquired during the interval shall be valid and enforceable.[16]

There are no cases that have interpreted MCL 450.2925.

Plaintiffs rely on *Bergy Bros, Inc v Zeeland Feeder Pig, Inc,*[17] which interpreted a previous version of this statute. In *Bergy Bros*, the plaintiff brought suit against the defendant corporation for money owed pursuant to deliveries of feed made by the plaintiff to the defendant's pig farm between August 1971 and September 1972.[18] The defendant's corporate charter was voided in

---

[15] *Middlebrooks v Wayne Co,* 446 Mich 151, 166 n 41; 521 NW2d 774 (1994); *D'Avanzo v Wise & Marsac, PC,* 223 Mich App 314; 565 NW2d 915 (1997).

[16] Emphasis added.

[17] *Bergy Bros, Inc v Zeeland Feeder Pig, Inc,* 415 Mich 286; 327 NW2d 305 (1982).

[18] *Id.* at 290.

May 1971 for failing to file reports and pay fees in 1969, 1970, and 1971.[19] Although the plaintiff "vigorously maintained throughout trial that it dealt only with the corporation,"[20] the plaintiff also asserted "that when the corporation failed to file its annual report and pay its franchise fee, pursuant to the statute its corporate existence was extinguished" rendering the officers and directors personally liable.[21] The Court noted that the corporate charter had been revived by the time of trial.[22]

The trial court and this Court had both held that the defendant corporation had lost even de facto existence when its charter was forfeited in 1971.[23] The Michigan Supreme Court disagreed, concluding:

> This theory is premised on the assumption that the forfeiture makes the corporation nonexistent. In Michigan, the statute providing for forfeiture of the charter must be read in light of the statute providing for retroactive reinstatement of the charter. Thus, because the charter is subject to reinstatement, this Court has said: "The corporation does not cease to exist upon its charter becoming absolutely void". *Stott v Stott Realty Co*, 288 Mich 35, 42; 284 NW 635 (1939). . . . The effect of the reinstatement statute is to make the voidance of the charter more in the nature of a suspension of corporate privileges than an absolute termination of corporate existence. . . .
>
> . . . Where, as here, the corporate charter has been reinstated pursuant to the statute, the corporation should be considered to have had at least de facto existence during the period of forfeiture, which would preclude application of the partnership theory of liability.[24]

---

[19] *Id.*

[20] *Id.* at 291.

[21] *Id.*

[22] *Id.* at 294.

[23] *Id.* at 295.

[24] *Id.* at 295-296.

*Stott*, the case cited by the Supreme Court, involved the plaintiff shareholders filing suit alleging the corporate charter was void for failure to pay fees for two consecutive years and requesting a receiver be appointed to wind up the affairs.[25] The defendants denied that the corporation had ceased to exist, noting that the required fees had been paid since the plaintiffs had filed their suit, placing the corporation in good standing.[26] As quoted in *Bergy Bros*, the *Stott* Court noted that "[t]he corporation does not cease to exist upon its charter becoming absolutely void."[27] However, it went on:

> It still continues a body corporate and remains a legally existing corporation for certain purposes. . . .
>
> From the foregoing, it may be said that a corporation whose charter has become void may thereafter be reinstated. The voiding of the corporate charter does not work a dissolution and put an end to corporate life. While a corporation having had its charter declared void *cannot carry on corporate business for the purposes for which it is authorized* on the granting of its charter, *it still exists for certain other purposes of winding up its business and closing its affairs*. The corporation not having been dissolved and still being in existence, its corporate powers may be revived . . . .[28]

The Court continued, noting that the appellant stockholder, after the filing of the lawsuit, "attended a stockholders' meeting, voted for directors, participated in a directors' meeting, took part in an election of officers, and was himself elected vice-president" so that his own conduct recognized "the company as a functioning corporation . . . ."[29]

---

[25] *Stott*, 288 Mich at 39.

[26] *Id.*

[27] *Id.* at 42.

[28] *Id.* at 42-43 (citations omitted; emphasis added).

[29] *Id.* at 48.

Neither *Stott* nor *Bergy Bros* is precisely on point. *Stott* involved a stockholder suit attempting to force the corporation to wind up where the appellant stockholder's own actions belied his belief that the corporation had ceased to exist.[30] *Bergy Bros* recognized the de facto existence of the corporation in order to avoid imposing partnership liability. This result is reasonable and logical given that the plaintiff "vigorously maintained throughout trial that it dealt only with the corporation . . . ."[31] The holding is also consistent with the language in MCL 450.2925(2) that, upon reinstatement, "all contracts entered into and other rights acquired during the interval shall be valid and enforceable." Neither case, however, provides guidance in answering the question whether a party who is required to provide notice of some event to the corporation, which has ceased to exist for 16 years, could be deemed to have failed to properly give notice on the grounds that, sometime in the future, the corporation might seek reinstatement.

It is not reasonable to require persons to give notice to a nonexistent corporation on the contingent basis that at some unknown time in the future, some unknown person might elect to reinstate the corporation. Simply because someone can reinstate a corporation under MCL 450.2925 does not mean anyone will. And the law certainly should not require people to assume otherwise. Indeed, some corporations that dissolve automatically never seek reinstatement, even when they continue to do business.[32] Others fail to seek reinstatement even when attempting to file suit in their own name.[33]

---

[30] *Id.*

[31] *Bergy Bros*, 415 Mich at 291.

[32] See *United Steelworkers v Forestply Indus, Inc*, 702 F Supp 2d 798 (WD Mich, 2010); *Mich Laborers' Health Care Fund v Taddie Constr, Inc*, 119 F Supp 2d 698 (ED Mich, 2000).

[33] *Flint Cold Storage v Dep't of Treasury*, 285 Mich App 483; 776 NW2d 387 (2009).

Further, plaintiffs incorrectly assert that the home-owners' association's continued collection of monies and exercise of obligations gave it a de facto existence after dissolution. In *Flint Cold Storage v Dep't of Treasury*, this Court reiterated that corporations continue to exist beyond their date of dissolution in order to wind up their affairs, but only for a reasonable amount of time.[34] "Otherwise, a dissolved corporation would languish in perpetuity, affording no true closure or finality for the stakeholders of the dissolved entity."[35] The determination of what constitutes a reasonable time is a question of law for the courts.[36] This Court then determined that a 32-year winding-up period was unreasonable, so that the plaintiff corporation did not exist and could not maintain its lawsuit.[37] "[O]nce a dissolved corporation has finished winding up its affairs, its existence is terminated and it ceases to exist for all purposes" including to sue and be sued.[38]

The type of legal, de facto existence created by MCL 450.2925 and *Bergy Bros* is based on the idea that corporations that are reinstated pursuant to the statute should be granted the benefits of corporate status— such as no individual liability. It is reasonable to give such corporations the benefits of the contracts they entered into and whatever rights they acquired.[39] This de facto legal existence, however, is just a legal creation. It provides a retroactive *legal* existence to a corporation even though, at that moment in the past, *factually*, the corporation had no such existence. Thus, notwithstand-

[34] *Id.* at 495-497.

[35] *Id.* at 496.

[36] *Id.* at 498.

[37] *Id.* at 498-500.

[38] *Id.* at 498.

[39] MCL 450.2925(2).

ing the fact that Center Woods's reinstatement in October 2009 created some type of legal existence for those prior 16 years, the actuality is that Center Woods did not exist when the sale between Averill and Res-Care took place. Accordingly, we conclude that Averill had no obligation to provide notice of the pending sale to Center Woods because, although it obtained a retroactive legal existence, it was, at the time of the pending sale, a nonexistent corporation.

In sum, based on the plain language of the articles of agreement, the trial court erred by holding that Averill ought to have provided notice to anyone other than the corporation. And the trial court further erred by holding that Center Woods was entitled to notice of the sale between Averill and Res-Care because Center Woods did not exist at that time. Because our resolution of this issue is dispositive, we decline to address Res-Care's remaining arguments.

We reverse the order granting summary disposition to plaintiffs and remand for entry of an order granting summary disposition to defendants. We do not retain jurisdiction.

SAWYER, P.J., and WHITBECK and M. J. KELLY, JJ., concurred.