NASH v DUNCAN PARK COMMISSION

NASH v DUNCAN PARK TRUST

Docket Nos. 309403 and 314017. Submitted December 10, 2013, at Grand
    Rapids. Decided March 20, 2014, at 9:00 a.m. Leave to appeal
    sought.

Martha Duncan executed a trust deed in 1913 concerning property
    in the city of Grand Haven that became Duncan Park. The trust
    deed either transferred the property to the city or conveyed
    legal ownership of the land to three trustees (the Duncan Park
    Commission). In November 2010, Diane Nash, personal repre-
    sentative of the estate of Chance A. Nash, deceased, brought a
    wrongful death action in the Ottawa Circuit Court against the
    Duncan Park Commission (the Commission), alleging that the
    decedent died as a result of injuries sustained in a sledding
    accident at Duncan Park and that the Commission negligently
    failed to maintain the sledding hill and failed to warn of its
    dangers. The Commission sought summary disposition, con-
    tending, in part, that the governmental tort liability act
    (GTLA), MCL 691.1401 et seq., barred the claim. The court, Jon
    Hulsing, J., granted the motion, reasoning that because the
    Commission was created by an ordinance and was authorized by
    the city, the Commission was a political subdivision. Plaintiff's
    motions for reconsideration and to amend the complaint were
    thereafter denied. Plaintiff appealed (Docket No. 309403).

    Plaintiff filed a second wrongful death suit in the Ottawa
    Circuit Court against the Duncan Park Trust and its three
    trustees, Edward Lystra, Rodney Griswold, and Jerry Scott, indi-
    vidually and as trustees of the Duncan Park Trust, asserting
    negligence and gross negligence claims. Plaintiff then moved to
    amend the complaint to add the park's groundskeeper, Robert
    DeHare, as a defendant, setting forth a vicarious liability claim
    against the individual defendants arising from DeHare's alleged
    negligence. The court, Jon Hulsing, J., granted summary disposi-
    tion in favor of defendants. The court determined that the city
    holds title to the fee and owns Duncan Park and that the
    Commission has exclusive management authority over the land.
    The court granted summary disposition to the Duncan Park Trust

on the basis of its ruling that the Duncan Park Trust does not exist. The court granted summary disposition to the named trustee-defendants because "there can be no trustees for a non-existent trust." The court also granted the same individuals summary disposition with respect to their roles as commissioners of the Duncan Park Commission on the basis of the court's prior ruling that the Commission "is a political subdivision that was created by the City and immune from tort liability." The court explained that, pursuant to MCL 691.1407(5), the commissioners qualify as the highest appointive executive officials of the Duncan Park Commission, thereby shielding them with immunity from suit. The court thereafter denied plaintiff's motion to amend the complaint to add new theories of liability against the named Duncan Park commissioners and trustees. The court also ruled that plaintiff could file a new claim against Robert DeHare. Plaintiff appealed these rulings (Docket No. 314017). The Court of Appeals consolidated the appeals.

The Court of Appeals *held*:

1. The trust deed created a trust that conveyed legal ownership of the land to the three trustees rather than to the city. The trust holds fee simple title to the park. Because the Commission is a private organization empowered by the trust to manage the park without any governmental oversight, the Commission may not invoke governmental immunity.

2. The trust deed created an active charitable trust. The language of the deed is that of a trust designed to place fee ownership of the land in the trustees rather than in the beneficiary.

3. The purpose of the trust falls within the purposes for which a charitable trust may be created.

4. The circuit court, in concluding that no trust existed, emphasized that plaintiff had not identified a separate document naming a "Duncan Park Trust." The court failed to consider that the trust deed itself qualified as the trust document. The trust deed's language fulfills all the criteria necessary to create a trust.

5. The circuit court's use of a definition for the word "trustee" as "Members of a governing board" is not supported by caselaw. The first definition of "trustee" considered by the court, "A person (or institution) to whom legal title to property is entrusted to use for another's benefit," fits the circumstances of this case better.

6. Because Mrs. Duncan placed the land in an express trust, the trustees own the land.

7. The precatory language in the second paragraph of the trust deed does not alter the remainder of the document's unambiguously stated intent to create a trust granting the land to the trustees.

8. A common-law dedication did not vest fee simple title in the city of Grand Haven. The fee simple title remained in the trustees.

9. The trust deed supports a conclusion that Mrs. Duncan intended a common-law dedication of the land for use as a park, which required acceptance by the city. Formal acceptance of the dedication was accomplished through the city's enactment of the ordinance required pursuant to the trust deed. However, a common-law dedication did not vest fee simple title in the city; rather, fee simple title remained in the trustees. Although the land was dedicated to the city for public purposes, ownership remained in the trustees.

10. The Commission is not a "governmental agency" as that term is defined in the GTLA. Whether viewed as the Commission or as three individual trustees, defendants are not a "political subdivision" of the city and therefore may not invoke the defense of governmental immunity.

11. The circuit court erred by determining that the Commission qualifies as a "political subdivision" because it was authorized by a political subdivision of the state. The statutory definition of "political subdivision" does not include commissions or commissions authorized by a city.

12. The Commission is not an "authority authorized by law" for purposes of the definition of a "political subdivision" in MCL 691.1401(e). No statute or caselaw supports a holding that a city may create an authority by ordinance absent an enabling law passed by the Legislature. No statutory provision permits the city of Grand Haven to form an authority involving only one park.

13. Rather than serving as an instrumentality or political subdivision of the city, the Commission is an independent, autonomous, private body that administers privately held land. The Commission acts solely on its own behalf. Rather than serving as an adjunct in the administration of city government, the Commission conducts no public business and independently manages land outside the city's control.

14. The definition of "governmental agency" does not include arrangements between governmental agencies and private entities or any other combined state-private endeavors. A private agency's performance of a governmental function does not confer governmental-agency status on the private entity.

15. The Commission is a unique construct of Martha Duncan's trust that is officially connected to the city only in the sense that the mayor ratifies the Commission's choice of successor members. The Commission controls private property without governmental oversight. The commissioners act on behalf of the trust, not on behalf of the city. The Commission is not immune from suit as a political subdivision of the city. The orders granting summary disposition on the ground of governmental immunity are reversed and the matter is remanded to the trial court in each action for further proceedings.

Reversed and remanded.

1. TRUSTS — ACTIVE TRUSTS — PASSIVE TRUSTS.

Active trusts differ from passive trusts in that they assign affirmative powers and duties to the trustee; passive trusts have been abolished in Michigan since 1846 (1846 RS 63).

2. TRUSTS — CHARITABLE TRUSTS.

A charitable trust may be created for the relief of poverty, the advancement of education or religion, the promotion of health, scientific, literary, benevolent, governmental or municipal purposes, or for other purposes the achievement of which is beneficial to the community (MCL 700.7405(1)).

3. TRUSTS — CREATION OF TRUSTS.

A trust is created when all of the following apply: the settlor has the capacity to create a trust, the settlor indicates an intention to create the trust, the trust has a definite beneficiary or is either a charitable trust or a trust for a noncharitable purpose or for the care of an animal, as provided in MCL 700.2722, the trustee has duties to perform, and the same person is not the sole trustee and sole beneficiary (MCL 700.7402(1)).

4. TRUSTS — CREATION OF TRUSTS.

No particular form of words is required to create a trust; to create a trust, there must be an assignment of designated property to a trustee with the intention of passing title thereto, to hold for the benefit of others; there must be a separation of the legal estate from the beneficial enjoyments to create a trust.

5. TRUSTS — CREATION OF TRUSTS.

A trust may be created by a deed, with a document called a trust deed.

6. REAL PROPERTY — DEDICATIONS OF LAND.

> A dedication of land is an appropriation of land to some public use that is accepted for such use by or in behalf of the public; a dedication requires a clear intent to dedicate on the part of the property owner and acceptance of the offer to dedicate by the public; Michigan recognizes two types of dedications: statutory and common law; the fee does not pass by a common-law dedication, only an easement passes.

7. TORTS — GOVERNMENTAL IMMUNITY — WORDS AND PHRASES — POLITICAL SUBDIVISIONS.

> The definition of "political subdivision" in the governmental tort liability act does not include commissions or commissions "authorized" by a city (MCL 691.1401(e)).

8. CONSTITUTIONAL LAW — CREATION OF AUTHORITIES.

> The Michigan Constitution grants the Legislature the power to create "authorities"; a city may not create an authority absent an enabling law passed by the Legislature (Const 1963, art 7, § 27).

9. TORTS — GOVERNMENTAL IMMUNITY — WORDS AND PHRASES — GOVERNMENTAL AGENCIES — POLITICAL SUBDIVISIONS.

> The governmental tort liability act defines "governmental agencies" as "this state or a political subdivision"; the definition does not include joint ventures, partnerships, arrangements between governmental agencies and private entities, or any other combined state-private endeavors; the act defines a "political subdivision" as a municipal corporation, county, county road commission, school or community college district, port district, metropolitan district, or transportation authority or a combination of two or more of these when acting jointly; the definition includes a district or authority authorized by the Legislature or formed by 1 or more political subdivisions or an agency, department, court, board, or council of a political subdivision (MCL 691.1404(a) and (e)).

10. TORTS — GOVERNMENTAL IMMUNITY — PRIVATE AGENCIES — GOVERNMENTAL FUNCTIONS.

> A private agency's performance of a governmental function does not confer governmental agency status on the private entity.

*John D. Tallman* for plaintiffs in both appeals.

*Merry, Farnen & Ryan, PC* (by *John J. Schutza*), for defendants in both appeals.

Before: WHITBECK, P.J., and HOEKSTRA and GLEICHER, JJ.

GLEICHER, J. These wrongful death actions arise from a sledding accident that took the life of 11-year-old Chance Nash. The accident occurred at Duncan Park in Grand Haven. The questions presented in these consolidated appeals center on the ownership of Duncan Park and whether the governmental tort liability act (GTLA), MCL 691.1401 *et seq.*, bars plaintiff's claims.

To answer these questions we begin by interpreting a document drafted 100 years ago. The circuit court ruled that this instrument transferred the park property from Martha Duncan to the city of Grand Haven. We conclude that the document created a trust that conveyed legal ownership of the land to three trustees rather than to the city.

The more difficult issue is whether the Duncan Park Commission (the Commission), which was established pursuant to Martha Duncan's trust, constitutes a "political subdivision" of the city of Grand Haven. Political-subdivision status would cloak the trustees and the Commission with governmental immunity. Because the Commission is a private organization empowered by the trust to manage the park without any governmental oversight, we hold that it may not invoke governmental immunity to avoid liability for Chance's death. Accordingly, we reverse the circuit court's contrary decision and remand for further proceedings.

## I. THE HISTORY OF DUNCAN PARK

The land comprising Duncan Park was originally owned by Martha and Robert Duncan. Martha Duncan inherited the land as her sole property after Robert's death. On October 22, 1913, Mrs. Duncan executed a trust

deed naming herself as the "Party of the First Part" and identifying as the "Parties of the Second Part" three individuals who would serve as "Trustees for and in behalf of the people of the city of Grand Haven."[1]

In the next paragraph, the trust deed states, in relevant part:

[Mrs. Duncan], desiring to transfer the land hereinafter described to the PEOPLE OF THE CITY OF GRAND HA-VEN, in order to perpetuate the name of her deceased husband . . . has GRANTED, BARGAINED, SOLD, RE-MISED, RELEASED, ALIENED AND CONFIRMED, and by these presents does sell, remise, release, alien, confirm and convey unto the Parties of the Second Part and to their successors in office forever, all that piece of land situated in the City of Grand Haven . . . known and described as follows . . . .

The third paragraph sets forth the legal description of the property. The fourth paragraph, the habendum clause, states that the property has been transferred "unto the said parties of the Second Part, and their Successors, forever in fee, upon the trusts, nevertheless, and to and for the uses, interests and purposes hereinafter limited, described and declared[.]"[2]

In the next several paragraphs, the trust deed conditions the land grant on: (1) the Grand Haven Common Council's acceptance of the dedication, (2) the Common Council's creation of a "Park Board" known as "The Duncan Park Commission," composed of the three named trustees granted full control and supervision of Duncan Park, and (3)

---

[1] The document's final paragraph refers to the writing as Mrs. Duncan's "Trust Deed and Deed of Gift." Accordingly, we refer to the document as a trust deed.

[2] A deed's habendum clause limits and defines the estate conveyed to the grantee. *Darnell v Smith*, 238 Mich 33, 37; 213 NW 59 (1927).

> The above-described premises shall be at all times known and described as "DUNCAN PARK" and said described parcel of land shall always be held and occupied by said grantees for and in behalf of the Citizens of the City of Grand Haven as a public park, for the use and enjoyment of the citizens or inhabitants of Grand Haven . . . .

The fourth condition outlawed liquor in the park, and the fifth required the city to "provide means for the care and improvement" of the park. Notably, this provision also states:

> But it shall be the right and duty of the said TRUSTEES to remove all dead, dying, or unsightly trees, to thin out the undergrowth, wherever necessary, to remove dead branches, noxious weeds, or other rubbish, and in short, keep said park in as neat and trim a condition as the means at their command will allow.

The assignment of active duties to the trustees signifies most tellingly that the drafter crafted a trust. As discussed in greater detail later in this opinion, the fifth provision insulated the trust from a legal challenge under the Michigan statute of uses; without it, the trust was subject to execution, i.e. nullification, as a purely passive device.

The sixth condition provided that "[n]o tax for improvements" on a portion of the park could be levied against Mrs. Duncan. The seventh appointed the "Trustees" as "The Duncan Park Commission," reiterating that the trustees and their successors would "have the exclusive supervision, management and control" of Duncan Park. The eighth provision states:

> This Deed is given on the express condition that the Common Council of the City of Grand Haven shall, on the acceptance thereof, pass an Ordinance satisfactory to the Grantor, creating a "DUNCAN PARK COMMISSION" as herein provided, and providing for its perpetuation in the manner herein specified; also providing for the care and maintenance of said

DUNCAN PARK. The repeal of said Ordinance, or any part thereof, at any future time, shall render this Deed null and void and make the same of no effect.

The ninth and final provision states that if the Duncan Park Commission should "cease to exist," the Ottawa Circuit Court shall "take charge of this trust and appoint a suitable 'DUNCAN PARK COMMISSION' to fulfill and carry out the terms of the trust for the benefit of the Citizens of the City of Grand Haven[.]"

On October 20, 1913, the city enacted an ordinance creating "The Duncan Park Commission," consisting of the three trustees. Section 5 of the ordinance provided:

It is the definite purpose of this ordinance to create and establish a permanent commission, which commission shall have the power and authority at all times to manage and control that plat of land deeded to the three trustees before mentioned for and in behalf of the citizens of the City of Grand Haven, by Mrs. Martha M. H. Duncan, for public park purposes, in accordance with the deed of gift of said park.

Since 1913, the trustees have selected their own successors and Grand Haven's mayor has duly appointed them to the Commission. The record substantiates that the city does not expend any funds to operate or maintain Duncan Park.

In 1994, the city's liability insurance carrier communicated to the mayor that "since the City and its residents were using the park, we could cover it for property and liability purposes." The insurance company declined to extend coverage to the Commission, however, without "some type of agreement." The city manager proposed that the city and the Commission enter into a "license agreement," which would require the city to provide general liability insurance coverage for the Commission and the park "in return for use of the park." "[A]s a

housekeeping matter," the city manager asked the city council to readopt the 1913 ordinance.

The license agreement was drawn between the Commission "acting as trustees for and in behalf of the people of the City of Grand Haven, Michigan" (the licensor) and the city of Grand Haven (the licensee). It states, in relevant part:

> A. The Licensor controls certain real property located in the City of Grand Haven . . . commonly known as "Duncan Park"[.]
>
>        \*   \*   \*
>
> 1. License. The Licensor grants to the Licensee, and the Licensee accepts from the Licensor, a non-exclusive, revocable, non-transferable license to use the Licensed Premises as a park solely for the benefit of the people of Grand Haven and for no other purposes. This is a license and Licensee understands and agrees that it is only permission to use the Licensed Premises and does not constitute any legal or possessory interest in the property.
>
>        \*   \*   \*
>
> 3. Insurance. The Licensee shall provide general liability insurance coverage for the Licensor and each of its three members with coverage for bodily injury (including death) and for property damage . . . .

Both parties signed the license and the city reenacted the 1913 ordinance. In particular, § 5 of the ordinance, quoted in its entirety earlier in this opinion, remained the same.

## II. THE PROCEDURAL HISTORIES OF THE CONSOLIDATED APPEALS

### A. THE INITIAL SUIT, DOCKET NO. 309403

In November 2010, plaintiff filed a lawsuit against the Commission, alleging that it negligently failed to

maintain the sledding hill and failed to warn of its dangers.[3] Following a one-year period of discovery, the Commission moved for summary disposition under MCR 2.116(C)(7) and (10), contending that the GTLA or, alternatively, the recreational use act (RUA), MCL 324.73301, barred plaintiff's suit. The gravamen of the Commission's GTLA argument was that the Commission constituted a "governmental agency" under then MCL 691.1401(d)[4] as a "political subdivision" of the state of Michigan.

The circuit court granted summary disposition to the Commission under MCR 2.116(C)(7), reasoning that because the Commission was created by ordinance and "authorized" by the city, the Commission constitutes a political subdivision. Further, the circuit court found, "Duncan Park is owned by a public entity," rendering the RUA inapposite.

Plaintiff then brought a motion for reconsideration and a motion to amend the complaint. Plaintiff's proposed amended complaint would have added as defendants the three Duncan Park commissioners and trustees (the same persons hold both positions) and the Duncan Park Trust.

The circuit court issued a written opinion and order summarizing its reasons for granting summary disposition and reaffirming its decision. "[F]or clarification" the court added that

> the actual ownership of Duncan Park does not affect the Court's decision. That is, even if a private entity is the fee owner of the real property that comprises the park, this does not affect the Court's decision to grant summary

---

[3] The complaint asserts that Chance died after his sled struck a dead tree covered in snow, causing a fatal abdominal injury.

[4] Following the enactment of 2012 PA 50, this definition was relocated to MCL 691.1401(a).

disposition based on [the] GTLA, because under MCL 123.54, a governmental function may occur on private land.

The circuit court also denied plaintiff's motion to amend the complaint. Plaintiff claimed an appeal from both the summary disposition and the amendment rulings.

### B. THE SECOND SUIT, DOCKET NO. 314017

In April 2012, plaintiff filed a second suit asserting negligence and gross negligence claims, naming as defendants the Duncan Park Trust and its three individual trustees, defendants Edward Lystra, Rodney Griswold, and Jerry Scott.

In lieu of filing an answer, defendants filed a motion for summary disposition under MCR 2.116(C)(7) and (10). Defendants contended that: (1) res judicata foreclosed plaintiff's claims; (2) the Commission and not the trust controlled the premises; (3) no actual trust exists, despite the donor's use of trust language in the document conveying the land; (4) the GTLA cloaks all defendants with immunity, and (5) the open and obvious danger doctrine barred the suit.

The circuit court permitted some discovery before considering whether summary disposition was warranted. Shortly after the circuit court entertained the parties' summary disposition arguments, plaintiff moved to amend the complaint to add Robert DeHare, the park's groundskeeper, as a party defendant. The proposed first amended complaint also set forth a vicarious liability claim against the individual defendants arising from DeHare's alleged negligence.

In a written opinion, the circuit court granted summary disposition to defendants. The circuit court first ruled that the "grantee" of Duncan Park was not

a trust but rather "the governmental unit[,] the City of Grand Haven—the entity that accepted the gift of land." The court specifically rejected that the deed "convey[ed] Duncan Park to any named trust." Rather, "it conveyed the land to 'trustees for and in behalf of the People of the City of Grand Haven' contingent upon the Common Council . . . accepting the premises." Further, the court pointed out, the trust deed made no mention of a "Duncan Park Trust" and plaintiff "cannot point to any document which names a 'Duncan Park Trust.' "

The court theorized that the document could also be deemed ambiguous, in which case "surrounding circumstances" would inform its construction. Those circumstances

> reveal that the City formally accepted the "gift" from Mrs. Duncan and created an ordinance which was acceptable to her. Contemporaneously, Mrs. Duncan conveyed the property. The actions of both grantor and the City reflect, and confirm, what is obvious from the language of the deed— that Duncan Park was conveyed to the City for the benefit of the People of Grand Haven.

Thus, the court held, the city "holds title to the fee."

The circuit court recognized that the licensing agreement tended to refute the court's conclusion that the city owned the park in fee.[5] It dispensed with this problem as follows:

> This latter agreement [the licensing agreement] was apparently prepared at the insistence of the insurance company for the City. Importantly, however, the City was not named as a party in this or the prior litigation. Therefore,

---

[5] "This is a license and Licensee understands and agrees that it is only permission to use the Licensed Premises any does not constitute and legal or possessory interest in the property."

there are no party admissions regarding ownership of Duncan Park and there certainly is no stipulation between the parties on this issue.

The circuit court also addressed MCL 554.351, which provides:

> No gift, grant, bequest or devise, whether in trust or otherwise to religious, educational, charitable or benevolent uses, or for the purpose of providing for the care or maintenance of any part of any cemetery, public or private, or anything therein contained which shall in other respects be valid under the laws of this state, shall be invalid by reason of the indefiniteness or uncertainty of the object of such trust or of the persons designated as the beneficiaries thereunder in the instrument creating the same, nor by reason of the same contravening any statute or rule against perpetuities. *If in the instrument creating such a gift, grant, bequest or devise, there is a trustee named to execute the same, the legal title to the lands or property given, granted, devised or bequeathed for such purposes, shall vest in such trustee.* If no such trustee shall be named in said instrument or if a vacancy occurs in the trusteeship, then the trust shall vest in the court of chancery for the proper county, and shall be executed by some trustee appointed for that purpose by or under the direction of the court; and said court may make such orders or decrees as may be necessary to vest the title to said lands or property in the trustee so appointed. [Emphasis added.]

The court acknowledged that the emphasized language arguably supported plaintiff's position, but again looked to the circumstances to discern Mrs. Duncan's intent. "Because of this, this Court cannot fall prey to any 'gotcha' words or phrases which run counter to the intent—evidenced in the entire deed—of the settlor." Thus, the court ruled, the city owns Duncan Park and the Commission "has exclusive management authority over the land."

The court granted summary disposition to the trust based on its ruling that the Duncan Park *Trust* does not exist. And because "there can be no trustees for a non-existent trust," the court granted summary disposition to the named trustee-defendants. It also granted the same individuals summary disposition in their roles as commissioners based on the court's prior ruling that the Commission "is a political subdivision that was created by the City and immune from tort liability." The court explained that pursuant to MCL 691.1407(5), the commissioners qualify as the " 'highest appointive executive official[s]' " of the Duncan Park Commission, thereby shielding them with immunity from suit.

In a subsequent opinion dated December 18, 2012, the circuit court denied plaintiff's motion to amend the complaint to add new theories of liability against the named Duncan Park commissioners and trustees. The court ruled that "[p]laintiff may file a new claim against a prospective defendant, Mr. DeHare." Plaintiff claimed a timely appeal from these rulings and this Court consolidated the appeals.

III. ANALYSIS

A. OWNERSHIP OF DUNCAN PARK

We begin by addressing the bedrock question: who owns Duncan Park? We conclude that the trust deed did, in fact, create a trust, and that the trust holds fee simple title to the park. This Court reviews de novo a circuit court's summary disposition ruling. *Walsh v Taylor*, 263 Mich App 618, 621; 689 NW2d 506 (2004). We also review de novo the interpretation of written instruments as a matter of law, *Woodbury v Res-Care Premier, Inc*, 295 Mich App 232, 243; 814 NW2d 308 (2012), and consider de novo issues of statutory inter-

pretation. *Lenawee Co v Wagley*, 301 Mich App 134, 167; 836 NW2d 193 (2013).

Our analysis begins in the year 1535, with England's adoption of the Statute of Uses. "The ancestor of the modern trust is the medieval *use* (from a corruption of the Latin word *opus*, meaning benefit)." Dukeminier, Sitkoff & Lindgren, Wills, Trusts, & Estates (8th ed, 2009), p 541 (emphases in original). Feudal landowners employed a use "to relieve tenants of the burdens of feudal landholding, to enable religious orders to have the benefit of land, and to effect greater freedom in the conveyancing of real property." Bogert, Trusts & Trustees (3d ed), § 4, p 26. The use conveyed land to third parties who would hold the land for the benefit of others, such as religious orders.[6]

Henry VIII sought to confiscate monastic property and to otherwise enrich his treasury by abolishing the use. At his behest, the English Parliament in 1535 enacted the Statute of Uses, 1535, 27 Henry VIII, c 10 (England). *Bogert* at 26-27. "The Statute of Uses provided that where any person should thereafter be seised of land 'to the use, confidence or trust' of any other person, the latter person shall be seised and possessed of the land in the same estate as that person would otherwise have in use." 1 Restatement Trusts, 3d, § 6, comment *a*, p 75. The statute thereby "extinguished the

---

[6] William Shakespeare referred to a use in *The Merchant of Venice*, near the end of the play (Act IV, Scene I). Shylock had been forced to forfeit half his property to the government and half to Antonio. Antonio offered to take the property in trust (use) for Shylock, with the principal going to Shylock's daughter and her husband upon Shylock's death:

So please my lord the duke and all the court
To quit the fine for one half of his goods,
I am content; so he will let me have
The other half in use, to render it,
Upon his death, unto the gentleman
That lately stole his daughter[.]

interest of the person who otherwise would hold title subject to the use" and vested the legal property interest in the beneficiary. *Id*.

Passive trusts are the modern day equivalents of uses.

> [A] trust declaration or a trust transfer 'to the use of' another, or 'in trust for' another, or 'for the benefit of' another, without describing any duties to be performed by the trustee in carrying out the use or trust, creates a trust that is clearly passive and that is executed by a transfer of the trustee's interest to the beneficiary, who thereafter holds as absolute owner. [Bogert, § 207, pp 40-41.]

Michigan's statute of uses, 1846 RS 63, abolished only passive trusts. *Saur v Rexford*, 369 Mich 338, 340; 119 NW2d 669 (1963).

Active trusts differ from passive trusts in that they assign affirmative powers and duties to the trustee. See 1 Restatement Trusts, 3d, § 6 (1) and (2), p 74; *Hunt v Hunt*, 124 Mich 502, 504; 83 NW 371 (1900). Professor Bogert distinguishes active trusts from passive trusts as follows: "At the other extreme are trusts that are clearly active because the settlor stated duties and powers that were substantial and important and not merely ministerial, mechanical, or nominal. Cases of this type include where the trustee is directed to manage the trust property[.]" Bogert, § 207, p 43. Professor Scott explains that active duties imposed on a trustee prevented the Statute of Uses from executing (i.e., legally eliminating) the trust. 1A Scott & Fratcher, Scott on Trusts (4th ed, 1987), § 69.1, p 406.

Michigan enacted a statute of uses abolishing passive trusts in 1846. 1846 RS 63. Our Legislature reenacted the same statute of uses in 1857, 1871, 1897, 1915, 1929, and 1948. The current version, found at MCL 555.1 *et seq*., is identical to the 1846 version except for minor formatting

and punctuation changes not relevant to our discussion. It provides: "Uses and trusts, except as authorized and modified in this chapter, are abolished, and every estate and interest in lands shall be deemed a legal right, cognizable as such in the courts of law, except when otherwise provided in this title." MCL 555.1. Pursuant to MCL 555.2, every estate that is now held as a use, executed under the laws of this state as they formerly existed, "is confirmed as a legal estate." MCL 555.3 expands on that concept by providing that the beneficiary of a use "shall be deemed to have a legal estate therein, of the same quality and duration, and subject to the same conditions as his beneficial interest."

However, MCL 555.4 creates an exception for active trusts: "The last preceding section shall not divest the estate of any trustees, in any existing trust, where the title of such trustees is not merely nominal, but is connected with some power of actual disposition or management, in relation to the lands which are the subject of the trust." And MCL 555.11 sets forth specific objects for which "express trusts"[7] may be created:

> Express trusts may be created for any or either of the following purposes:
>
> First. To sell lands for the benefit of creditors:
>
> Second. To sell, mortgage or lease lands, for the benefit of legatees, or for the purpose of satisfying any charge thereon:
>
> Third. To receive the rents and profits of lands, and apply them to the use of any person, during the life of such person, or for any shorter term, subject to the rules prescribed in the last preceding chapter:
>
> Fourth. To receive the rents and profits of lands, and to accumulate the same for the benefit of any married

---

[7] An "express trust" is a trust created by an instrument.

woman, or for either of the purposes, and within the limits prescribed in the preceding chapter:

Fifth. For the beneficial interest of any person or persons where such trust is fully expressed and clearly defined upon the face of the instrument creating it subject to the limitations as to time prescribed in this title.

MCL 555.16 states:

Every express trust, valid as such in its creation, except as herein otherwise provided, shall vest the whole estate in the trustees, in law and in equity, subject only to the execution of the trust; and the person for whose benefit the trust was created, shall take no estate or interest in the lands, but may enforce the performance of the trust in equity.

In 1912, our Supreme Court applied the Michigan statute of uses to "execute" (legally eliminate) a use, in that case a conveyance of property that the Court determined to have been merely a passive trust: "It will thus be seen that in this State passive trusts have been entirely abolished, and where a deed creates them the title passes at once to the beneficiary." *Rothschild v Dickinson*, 169 Mich 200, 207; 134 NW 1035 (1912). The Court explained: "There is nothing indicating the terms of the trust; no duties whatever given to the alleged trustee." *Id.*[8] *Hunt*, 124 Mich at 504, describes the powers and duties required of an active trust:

---

[8] A case decided by the Supreme Court in 1919 lends still more clarity to the active/passive trust distinction. In *Woolfitt v Histed*, 208 Mich 308; 175 NW 286 (1919), the Supreme Court considered whether a deed created a lawful trust. The Court held that the deed did not, explaining:

It is undisputed that the deed to John does not create an active trust. If a trust is created at all it is a naked or passive trust, which is defined to be "a trust in which the property is vested in one person upon trust for another, and the nature of the trust not being qualified by the settlor, is left to the construction of the law." Passive trusts are abolished by statute in this State, but where a deed is so worded as to create a passive or naked trust our statute

> The intention of the testatrix is entirely clear. She devised the real estate to her executors as trustees, with authority to sell, and to invest the proceeds in bond and mortgage, or such other ways as the said trustees should deem safe and advisable, the receipts therefrom to be paid over to her two sons during their lives. She empowered each of them to devise the property, whether it should be realty or personalty, but, should either fail to make a will, then it was to go to the heirs of each one. This intention of the testatrix must be carried out, unless to do so would be in direct violation of law. The trust was an active one[.]

We evaluate the trust deed against this legal backdrop. To survive the statute of uses the writing had to create an active trust.

The trust deed fulfills this requirement. Moreover, the language of the document is quintessentially that of a trust designed to place fee ownership of the land in the trustees rather than in the beneficiary.

### 1. THE ACTIVE, EXPRESS NATURE OF THE TRUST

The document's fifth paragraph provides, in relevant part:

> But it shall be the right and duty of the said TRUSTEES to remove all dead, dying, or unsightly trees, to thin out the undergrowth, wherever necessary, to remove dead branches, noxious weed, or other rubbish, and in short, keep said park in as neat and trim a condition as the means at their command will allow.

By vesting the trustees with well-defined duties, the drafter created an active trust that would survive a challenge brought under the statute of uses. The assignment of specific, active duties to the trustees forms the document's signature trust provision.

---

on uses and trusts executes it by forthwith passing the title to the beneficiary. [*Id.* at 314 (citations omitted).]

2. THE IMPACT OF EPIC

The Michigan Trust Code (MTC), MCL 700.7101 to 700.7913, forms a component of the Estates and Protected Individuals Code (EPIC), MCL 700.1101 *et seq.* The MTC applies to trusts created before its enactment, but does not impair accrued rights or affect an act done before its effective date. MCL 700.8206(1)(a) and (2). However, if any provision of the MTC "conflicts with any provision of 1846 RS 63, MCL 555.1 to 555.27," the MTC prevails. MCL 700.8206(3).

A reporter's comment for this section of the MTC further explains the relationship between the old and the newer law:

> The Michigan Statute of Uses and Trusts, 1846 RS 63, MCL 555.1 *et seq.*, has only limited application to modern trusts. It does not apply to trusts with personalty. . . . However, it continues to apply to trusts with direct interests in real estate. The Michigan Statute of Uses and Trusts has been largely unchanged since its enactment in 1846, and the act was based on a much older English statute that predates Michigan's statehood. Because many of the provisions of the Statute of Uses and Trusts have continuing utility, the Statute was not repealed in the course of enacting the MTC. For example, Statute § 1 through § 10 have continuing relevance in the area of real estate. However, § 11 through § 27 arguably conflict with aspects of the MTC. Because the MTC is the more comprehensive and modern statute, if there is a conflict between the two statutes, subsection (3) provides that the terms of the MTC will prevail. A similar amendment was made to the Statute of Uses and Trusts to add a new § 28 in the Statute of Uses and Trusts, effective April 1, 2010. [Martin, Estates & Protected Individuals Code: With Reporter's Commentary (February 2013 update) (Ann Arbor: Institute of Continuing Legal Education), p 507.]

EPIC lacks direct relevance to whether the indenture created a trust, because Mrs. Duncan's intent must be gleaned from the legal environment in 1913. However, even if EPIC and the MTC applied to this analysis, the provisions of the indenture permit it to be construed as a trust. MCL 700.7405(1) allows the creation of a charitable trust "for the relief of poverty, the advancement of education or religion, the promotion of health, scientific, literary, benevolent, governmental, or municipal purposes . . . or other purposes the achievement of which is beneficial to the community." Here, the trust deed provides that Mrs. Duncan created the Duncan Park Trust for the benefit of Grand Haven and its people. Thus, the purpose of this trust falls within the statutory definition.

MCL 700.7402(1) provides that a trust is created if all of the following apply:

(a) The settlor has capacity to create a trust.

(b) The settlor indicates an intention to create the trust.

(c) The trust has a definite beneficiary or is either of the following:

(i) A charitable trust.

(ii) A trust for a noncharitable purpose or for the care of an animal, as provided in [MCL 700.2722].

(d) The trustee has duties to perform.

(e) The same person is not the sole trustee and sole beneficiary.

For the reasons already discussed, the Duncan Park Trust qualifies as charitable and active, thereby meeting the only pertinent statutory requirements. Application of this statute does not change the analysis, because the document's language signifies an intent to create a charitable trust vesting the trustees with specific duties.

### 3. THE INDENTURE'S USE OF TRUST LANGUAGE

Moreover, the document's language clearly contemplates the establishment of a trust. "[I]t requires no particular form of words to create a trust." *Brooks v Gillow*, 352 Mich 189, 199; 89 NW2d 457 (1958). " 'A person need use no particular form of words to create a trust or to make himself a trustee. It is enough if, having the property, he conveys it to another in trust[.]' " *Hamilton v Hall's Estate*, 111 Mich 291, 296; 69 NW 484 (1896), quoting *Ray v Simmons*, 11 RI 266, 268 (1875). The fundamental characteristics that distinguish a trust from other legal relationships are the existence of a fiduciary relationship and the holding of title to property by one person for the benefit of another. 1 Restatement Trusts, 2d, § 2, p 6. "To create a trust, there must be an assignment of designated property to a trustee with the intention of passing title thereto, to hold for the benefit of others. There must be a separation of the legal estate from the beneficial enjoyments." *Equitable Trust Co v Milton Realty Co*, 261 Mich 571, 577; 246 NW 500 (1933) (citation omitted).

> An express trust must be an explicit declaration of trust, accompanied by an intention to create such an estate and followed by an actual conveyance or transfer of definite property, or estate or interest made by a person capable of such a transfer and for a definite term, which vests the legal title in a person capable of holding as trustee for the benefit of a cestui que trust or purpose, to which the trust fund is to be applied or the retention of title by the owner under circumstances which clearly and unequivocally disclose intent to hold for use of another. [*Buhl v Kavanagh*, 118 F2d 315, 320 (CA 6, 1941).]

Nor do charitable trusts require formulaic words:

> "A charitable trust, like an express private trust, is created only if the settlor properly manifests an intention

to create it. The settlor need not, however, use any particular language in showing his intention to create a charitable trust; he need not use the word 'trust' or 'trustee.' It is sufficient if he shows an intention that the property should be held subject to a legal obligation to devote it to purposes which are charitable." [*Knights of Equity Mem Scholarships Comm v Univ of Detroit*, 359 Mich 235, 242; 102 NW2d 463 (1960), quoting 4 Scott, Trusts (2d ed), § 351, p 2574.]

In concluding that no trust existed, the circuit court emphasized that plaintiff had not identified a separate document naming a "Duncan Park Trust." The circuit court failed to consider that the trust deed itself qualified as the trust document. The trust deed's language fulfills all the criteria necessary to create a trust.

Starting from the end, the document refers to itself as a "Trust Deed." Our caselaw recognizes that a trust may be created by a deed, with a document called a trust deed. *In re Sweetser's Estate*, 109 Mich 198, 204; 67 NW 130 (1896). See also *Thatcher v Wardens of St Andrew's Church of Ann Arbor*, 37 Mich 264, 273 (1877) ("Our statute, [1871 CL 3062] and How. Stat. § 4637 fully authorizes the conveyance in trust for the purpose mentioned in this deed and vests the title in perpetual succession in the trustees provided for by the statute in trust for the church. We are of opinion that the objections made to the validity of this trust deed are not valid, and that it is unnecessary to discuss the other questions raised.").

The ninth paragraph clearly sets forth Mrs. Duncan's intent to create a trust:

If at any time in the future the "DUNCAN PARK COMMISSION" shall cease to exist, the Circuit Court for the County of Ottawa in Chancery, or such Court as shall succeed the same, shall, on the application of any Citizen of the City of Grand Haven, *take charge of this trust* and

appoint a suitable "DUNCAN PARK COMMISSION" *to fulfill and carry out the terms of the trust for the benefit of the Citizens of the City of Grand Haven*; and the Commission so appointed shall thereafter choose its own successors in the same manner as herein provided.

The habendum clause transfers the property from Martha Duncan (the party of the first part) to the parties of the second part "TO HAVE AND TO HOLD . . . *forever in fee, upon the trusts*, nevertheless, and to and for the uses, interests and purposes hereinafter limited, described and declared[.]" (Emphasis added). This language, too, shows the creation of a trust.

The circuit court recognized that the trust deed's repetitive use of the term "trustees" suggested a trust. Citing *Webster's Online Dictionary*, the circuit court set forth three definitions of the word "trustee." The second, as quoted by the circuit court, is: "Members of a governing board." The circuit court accepted that definition rather than the other two, the first of which was: "A person (or institution) to whom legal title to property is entrusted to use for another's benefit."

The term "trustee" has been defined by our Supreme Court as follows: "A trustee, in the widest meaning of the term, may be defined to be a person in whom some estate, interest, or power in or affecting property of any description is vested for the benefit of another." *Equitable Trust Co v Milton Realty Co*, 263 Mich 673, 676; 249 NW 30 (1933) (quotation marks and citation omitted). No Michigan case uses the term "trustee" in the manner proposed by the circuit court, and we decline to do so. Further, the first definition of "trustee" better fits the circumstances of this case, because Mrs. Duncan entrusted the property to the Duncan Park Trust for the use and benefit of the community.

In addition to the "trustee duties" clause included to avoid the statute of uses, the trust deed's reverter provision is entirely consistent with Mrs. Duncan's intent to place the property in trust rather than to grant it outright to the city. The third condition specifically provided that if the "Council or said Trustees shall neglect or refuse to carry out in good faith all of the terms and conditions herein specified," the premises

> shall revert to the first party herein, her heirs, executors or assigns and become again vested in her, or her heirs, as fully as if such dedication had never been made; and she, her heirs, or executors, may then enter upon and take possession of said premises and thenceforward hold the same as fully as if this dedication had never been made.

This language supports that Mrs. Duncan placed the land in trust to empower enforcers of her will that the land perpetually remain a park. By placing the land in a trust rather than conveying it to the city directly, Mrs. Duncan gained assurance that if the city breached any of the conditions set forth in the trust deed, the trust would sue to regain the city's compliance.

#### 4. THE TRUSTEES OWN THE LAND

Because Mrs. Duncan placed the land in an express trust, the trustees own the land. 1897 CL 8844, provided:

> Every express trust, valid as such in its creation, except as herein otherwise provided, shall vest the whole estate in the trustees, in law and in equity, subject only to the execution of the trust; and the person for whose benefit the trust was created, shall take no estate or interest in the lands, but may enforce the performance of the trust in equity.

As described by our Supreme Court:

> The trusts contained in this will are express as well as active trusts, and, in so far as they are valid, vest the whole estate in the trustees, in law and in equity, subject only to the execution of the trust; and the persons for whose benefits the trust was created take no estate or interests in the lands, but they may enforce the performance of the trust in equity. [*Palms v Palms*, 68 Mich 355, 380; 36 NW 419 (1888) (opinion by CHAMPLIN, J.).]

Today, the same statutory language is found in MCL 555.16.

A second statute, MCL 554.351, lends additional support to this conclusion. The first sentence of the statute states:

> No gift, grant, bequest or devise, whether in trust or otherwise to religious, educational, charitable or benevolent uses, or for the purpose of providing for the care or maintenance of any part of any cemetery, public or private, or anything therein contained which shall in other respects be valid under the laws of this state, shall be invalid by reason of the indefiniteness or uncertainty of the object of such trust or of the persons designated as the beneficiaries thereunder in the instrument creating the same, nor by reason of the same contravening any statute or rule against perpetuities.

The statute's second sentence, acknowledged but substantively ignored by the circuit court, states: "If in the instrument creating such a gift, grant, bequest or devise, there is a trustee named to execute the same, the legal title to the lands or property given, granted, devised or bequeathed for such purposes, shall vest in such trustee." 1907 PA 122 included this same sentence.

Only the following sentence, found in the trust deed's second paragraph, lends any credence to the notion that

the instrument transferred the land directly to the city rather than to the trustees:

> WITNESSETH THAT the said Party of the First Part, desiring to transfer the land hereinafter described to the PEOPLE OF THE CITY OF GRAND HAVEN, in order to perpetuate the name of her deceased husband, ROBERT W. DUNCAN, for and in consideration of the sum of One Dollar ($1.00) to her in hand paid (receipt whereof is hereby acknowledged) has GRANTED, BARGAINED, SOLD, REMISED, RELEASED, ALIENED AND CONFIRMED, and by these presents does sell, remise, release, alien, confirm and convey unto the Parties of the Second Part and to their successors in office forever, all that piece of land situated in the City of Grand Haven in the County of Ottawa and the State of Michigan, known and described as follows[.]

Read in its entirety, this paragraph indicates that Mrs. Duncan "granted" and "convey[ed] unto the Parties of the Second Part" the park premises. The language that begins the sentence, "WITNESSETH THAT the said Party of the First Part, desiring to transfer the land hereinafter described to the PEOPLE OF THE CITY OF GRAND HAVEN," is precatory. "The mere use of the precatory words 'desire' and 'request' will not be sufficient to create an enforceable trust, or a power in the nature of a trust, when the context clearly shows that the testator's intention was the contrary." *Thomas v Ohio State Univ Bd of Trustees*, 70 Ohio St 92, 109; 70 NE 896 (1904). The habendum clause that followed unambiguously stated that the land was to be held by the trustees and their successor, "forever in fee, upon the trusts, nevertheless[.]"[9] In context, the precatory language does not alter the remainder of the docu-

---

[9] Were we to conclude that the granting and habendum clauses conflict, the habendum clause would control:

ment's unambiguously stated intent to create a trust granting the land to the trustees.

### 5. THE DEDICATION DID NOT VEST OWNERSHIP IN THE CITY

Although not raised in the circuit court, defendants now argue that the "Duncan Deed, by its explicit terms, constituted a common-law 'dedication' of property for a public use." Defendants are correct. The indenture likely did anticipate that the land would be dedicated by the city of Grand Haven for public use. However, a common-law dedication did not vest fee simple title in the city of Grand Haven; rather, fee simple title remained in the trustees.

"A 'dedication' of land is an 'appropriation of land to some public use, accepted for such use by or in behalf of the public.' " *2000 Baum Family Trust v Babel*, 488 Mich 136, 144; 793 NW2d 633 (2010), quoting *Clark v Grand Rapids*, 334 Mich 646, 656-657; 55 NW2d 137 (1952). A dedication requires "a clear intent to dedicate on the part of the" property owner, "as well as an acceptance by the public[.]" *Lee v Lake*, 14 Mich 12, 18 (1865). Acceptance of an offer to dedicate land to public use is essential to a completed dedication. *Field v Village of Manchester*, 32 Mich 279, 281 (1875). Two types of dedications are recognized in Michigan: statu-

---

[A] repugnancy between the granting clause and the habendum must be resolved, as a rule of construction, in favor of the former when "it cannot be determined from the whole instrument and the attendant circumstances" which the grantor intended to control; "but, where it appears from the whole conveyance and the attendant circumstances that the grantor intended the habendum to enlarge, restrict, or repugn the granting clause, the habendum must control, for the reason that it is the last expression of the grantor's wish as to the conveyance." [*Thompson v Thompson*, 330 Mich 1, 5; 46 NW2d 437 (1951), quoting *Powers v Hibbard*, 114 Mich 533, 553; 72 NW 339 (1897).]

tory and common law. *Gunn v Delhi Twp*, 8 Mich App 278, 282; 154 NW2d 598 (1967). "[B]y a common-law dedication the fee does not pass, but only an easement." *Badeaux v Ryerson*, 213 Mich 642, 647; 182 NW 22 (1921).

The trust deed supports that Mrs. Duncan intended a common-law dedication of the land for use as a park, which required acceptance by the city. Formal acceptance of the dedication was accomplished through the enactment of the ordinance required pursuant to the trust deed. See *West Mich Park Ass'n v Dep't of Conservation*, 2 Mich App 254, 265; 139 NW2d 758 (1966), quoting 23 Am Jur 2d, Dedication, § 50 (" 'Formal acceptance may consist of a formal ratification by the proper official board of the municipality, a formal resolution or order by any other proper official body, the adoption of a municipal ordinance, the vote of a town council, the signing of a written instrument by the proper authorities, the execution of an official map by a city showing the street offered to be dedicated as such, or an act of the legislature incorporating a town, or adopting a map showing its limits.' ") (emphasis omitted). See 23 Am Jur 2d, Dedication, § 47 (2013). It bears emphasis that the ordinance specifically acknowledged that the "plat of land" comprising the park was "deeded to the three trustees[.]"

In 1913, the leading case concerning common-law dedications was *Patrick v Young Men's Christian Ass'n of Kalamazoo*, 120 Mich 185; 79 NW 208 (1899). The land at issue in *Patrick* was platted by Stephen H. Richardson in 1831. *Id.* at 186-187. Pursuant to the plat map, a portion of the land was " 'appropriated to the four first religious denominations who may form societies in the foregoing town, and erect buildings thereon; one-fourth to the benefit of each society.' " *Id.* at 187.

This area was known as "Church Square." *Id*. In 1838, Richardson and his wife owned the land surrounding Church Square, and quitclaimed it to Johnson Patrick "without any exception of streets or squares[.]" *Id*.

Over the next several decades the land was conveyed to different people, including Patrick's heirs. In 1837, St. Luke's Protestant Episcopal Society "erected a church building on the premises, and occupied the lot until March 18, 1887, when it deeded the property by quitclaim deed to Senator Stockbridge[.]" *Id*. at 188. Stockbridge deeded the property to the Young Men's Christian Association, which erected a building on it. *Id*. The plaintiffs, heirs at law of Johnson Patrick, contended that "Church Square" belonged to them rather than to the YMCA. *Id*. at 186.

The Supreme Court began its analysis by examining the plat: "If the plat was valid, and conveyed an absolute fee to the religious society, it is manifestly the end of the plaintiffs' claim, because Richardson then parted with his entire title." *Id*. at 189. The Court continued, "If it was valid, but did not convey the fee, the plaintiffs must show that they own the reversionary interest." *Id*. The Court determined that the original platters accomplished a common-law dedication of the land to a public use, rather than a statutory dedication, and that the fee ownership had remained in Richardson until he conveyed it to Patrick. The Court explained, "Common-law dedications do not ordinarily convey the fee. In fact, under the strict rule they never do." *Id*. at 192.

*Patrick* has withstood the test of time. In *2000 Baum Family Trust*, 488 Mich at 148, the Supreme Court reiterated that under the common law, fee ownership of dedicated property remains in the original owner. Accordingly, defendants' late-raised dedication argument

is unavailing. Although the land was dedicated to the city of Grand Haven for public purposes, ownership remained in the trustees.

### B. GOVERNMENTAL IMMUNITY

We next consider whether governmental immunity bars plaintiff's suit against the trustees and the Commission. The circuit court dismissed both cases under MCR 2.116(C)(7), immunity granted by law. A summary disposition motion brought under subrule (C)(7) "does not test the merits of a claim but rather certain defenses" that may eliminate the need for a trial. *DMI Design & Mfg, Inc v Adac Plastics, Inc*, 165 Mich App 205, 208; 418 NW2d 386 (1987). (2010). When reviewing a grant of summary disposition under subrule (C)(7), this Court accepts as true the plaintiff's well-pleaded allegations and construes them in the light most favorable to the plaintiff. *Id.* at 208-209. "If no facts are in dispute, and if reasonable minds could not differ regarding the legal effect of those facts," whether immunity bars the claim is a question of law for the court. Under this subrule, summary disposition may be granted when a claim is barred because of immunity granted by law. *Dextrom v Wexford Co*, 287 Mich App 406, 429; 789 NW2d 211 (2010).

We hold that the Commission is not a "governmental agency" as that term is defined in the GTLA. The Commission is a private body accountable only to itself, not to the city of Grand Haven. The Commission manages Duncan Park without oversight, direction, or financial contribution from the city. Its sole connection with the city derives from the ordinance's requirement that the mayor ratify the Commission's choice of its own commissioners. Whether viewed as the Commission or as three individual trustees, defendants are not

a "political subdivision" of the city of Grand Haven and therefore may not invoke the defense of governmental immunity.

Except for certain limited statutory exceptions, MCL 691.1407(1) grants tort immunity to governmental agencies "engaged in the exercise or discharge of a governmental function." The parties agree that maintaining a park is an exercise of a governmental function. The parties' disagreement centers on whether the Commission is a "governmental agency" entitled to immunity. The GTLA affords immunity to "governmental agencies," which the statute defines as "this state or a political subdivision." MCL 691.1401(a).[10] A "political subdivision" is

> a municipal corporation, county, county road commission, school district, community college district, port district, metropolitan district, or transportation authority or a combination of 2 or more of these when acting jointly; a district or *authority authorized by law* or formed by 1 or more political subdivisions; or an agency, department, court, board, or council of a political subdivision. [MCL 691.1401(e) (emphasis added).][11]

The circuit court ruled that the Commission "was authorized by a political subdivision of the State," and therefore qualified as a "political subdivision." Defendants argue that the Commission falls within the statutory definition of a "political subdivision" because it "is an 'authority authorized by law,' namely, as created by City of Grand Haven ordinance." The statutory language governs our analysis.

When the Legislature defines a term used in a statute, the Court must accept the statutory definition.

---

[10] Before the enactment of 2012 PA 50, this definition was located in subdivision (d).

[11] This definition was formerly located in subdivision (b).

*Erlandson v Genesee Co Employees' Retirement Comm*, 337 Mich 195, 204; 59 NW2d 389 (1953). "Where, as here, a statute supplies its own glossary, courts may not import any other interpretation, but must apply the meaning of the terms as expressly defined." *Detroit v Muzzin & Vincenti, Inc*, 74 Mich App 634, 639; 254 NW2d 599 (1977). " '[W]hen a statute specifically defines a given term, that definition alone controls. Therefore, a statutory definition supersedes a commonly accepted dictionary or judicial definition of a term.' " *People v Williams*, 288 Mich App 67, 74; 792 NW2d 384 (2010), quoting 22 Michigan Civil Jurisprudence (2005 revision), § 202, p 731.

The Commission's entitlement to governmental immunity depends on whether it falls within the definition of "political subdivision" set forth in MCL 691.1401(e). We reject the circuit court's determination that the Commission qualifies as a "political subdivision" because it "was authorized by a political subdivision of the State." The statutory definition of "political subdivision" does not include "commissions," nor does it include commissions "authorized" by a city.

Defendants contend that the Commission is an "authority authorized by law." Neither the trust nor the ordinance refers to the Commission as an "authority." Furthermore, a city lacks the power to unilaterally create an "authority"; only the Legislature may do so.

Const 1963, art 7, § 27 states:

Notwithstanding any other provision of this constitution the legislature may establish in metropolitan areas additional forms of government or authorities with powers, duties and jurisdictions as the legislature shall provide. Wherever possible, such additional forms of government or authorities shall be designed to perform multipurpose functions rather than a single function.

Thus, the Constitution grants to the *Legislature* the power to create "additional forms of government or authorities." No statute or caselaw supports that a city may create an "authority" by ordinance absent an enabling "law" passed by the Legislature. Rather, the term "authority authorized by law" refers to authorization by the Legislature. And defendants have not identified any statutory provision permitting the city of Grand Haven to form an "authority" involving only one park. Accordingly, the Commission is not an "authority authorized by law."

Although not argued by defendants, we have considered whether the Commission is a "board," thereby qualifying as immune under MCL 691.1401(e). The trust deed mandated that the city enact an ordinance creating the Commission. The ordinance was drafted by Mrs. Duncan and her counsel and enacted exactly as specified. The ordinance states in the first paragraph:

> That thereby and hereby is, created in the City of Grand Haven, a Park Board, to be known as "The Duncan Park Commission," to consist of three members, who shall be appointed by the mayor of the City of Grand Haven, in accordance with the deed of gift of "Duncan Park," wherein and whereby the plat of land known as "Duncan Park" was transferred to three (3) trustees for and in behalf of the citizens of the City of Grand Haven, Michigan.

Although nominally a "Park Board" pursuant to the ordinance, Grand Haven's charter does not recognize the "Duncan Park Board" as one of the city's "citizen boards." Grand Haven Charter § 7.14(a) provides:

> To afford citizen participation in the affairs of the city government for the purpose of determining community

needs and means of meeting such needs through the government of the city, the following citizen boards are established:

(1) An airport board;

(2) A cemetery board;

(3) A Community Center board;

(4) A harbor board;

(5) A library board;

(6) A parks and recreation board.

The boards consist of five Grand Haven citizens appointed by the mayor "subject to confirmation by the council . . . ." Section 7.14(b). The boards meet at least monthly, and their minutes are "public record." Section 7.14(c). The boards report to the city council, which may remove a board member for "malfeasance, misfeasance, or nonfeasance." *Id.*

Whether labeled a board or an authority, the Commission and its trustees exercise their powers without municipal oversight. The trustees do not report to any elected official, take no guidance from the city of Grand Haven, and are not accountable for their actions to the city. The ordinance provides:

[S]aid commission shall make its own rules and regulations and shall be governed thereby and shall have the entire control and supervision of said "Duncan Park." . . . Said commission shall also have power to adopt rules and regulations governing the duties of its members and each of its officers and employees, and shall have the authority to engage and discharge its own employees.

Aside from appointing the original three trustees to the Commission, the city plays no part in the ongoing management of Duncan Park. Rather than serving as an instrumentality or "political subdivision" of Grand Haven, the Commission is an independent, autono-

mous, private body that administers privately held land.[12] While agencies, boards, or authorities act on behalf of cities or towns, the Commission acts solely on its own behalf. Rather than serving as an adjunct in the administration of city government, the Commission conducts no public business; it independently manages land outside the city's control. Designating the Commission a "board" does not transform a private group into a political subdivision.

Further, "the definition of 'governmental agency' does not include, or remotely contemplate, joint ventures, partnerships, *arrangements between governmental agencies and private entities*, or any other combined state-private endeavors." *Vargo v Sauer*, 457 Mich 49, 68; 576 NW2d 656 (1998) (emphasis added). Nor does a private agency's performance of a governmental function confer governmental-agency status on the private entity. *Jackson v New Ctr Community Mental Health Servs*, 158 Mich App 25, 35; 404 NW2d 688 (1987). In *O'Neill v Emma L Bixby Hosp*, 182 Mich App 252, 257; 451 NW2d 594 (1990), this Court held that Bixby Hospital, "a nonprofit, nonstock Michigan corporation which was incorporated by individuals" did not qualify as a hospital " 'formed by 1 or more political subdivisions.' " The Court explained: "Bixby Hospital retains a separate, nongovernmental, corporate identity. Its em-

---

[12] Grand Haven City Manager Pat McGinnis testified as follows at his deposition:

> *Q.* . . . . It's my understanding that those documents create the Duncan Park Commission as an autonomous body that has the sole supervisory control of Duncan Park. Is that your understanding, too?

> MS. MERRY [defense counsel]: Objection, form. Go ahead and answer.

> THE WITNESS: Essentially I agree with your statement.

ployees are not municipal employees. Defendant is not operated by the city, but by a board of trustees which is quasi-independent from the city." *Id.* The city of Adrian's "indirect control of the hospital through the appointment of the members of the hospital commission/board of trustees" did not sway this Court. *Id.* "Despite the substantial connections with the City of Adrian," this Court held that Bixby Hospital was not a governmental agency entitled to immunity. *Id.* at 257-258.

The Commission is a unique construct of Martha Duncan's trust that is officially connected with the city of Grand Haven only in the sense that the mayor ratifies the Commission's choice of successor members. Otherwise, the city has undertaken no official activities relative to Duncan Park. It does not make the rules for the park, supervise the park, maintain the park, direct the park's use, or expend any funds to maintain the park. Rather, the Commission, a privately appointed group of three trustees, controls private property without governmental oversight. The commissioners act on behalf of the trust, not on behalf of the city. Accordingly, the Commission is not immune from suit as a political subdivision of the city of Grand Haven.

We reverse the circuit court's grants of summary disposition on the ground of governmental immunity and remand for further proceedings. We do no retain jurisdiction.

WHITBECK, P.J., and HOEKSTRA, J., concurred with GLEICHER, J.