*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

STEPHANIE BRITT,

      Plaintiff-Appellee/Cross-Appellant,

v

MCLAREN FLINT,

      Defendant-Appellant/Cross-Appellee.

UNPUBLISHED
July 23, 2020

No. 347763
Genesee Circuit Court
LC No. 17-109646-CL

Before: METER, P.J., and BECKERING and O'BRIEN, JJ.

PER CURIAM.

Defendant, McLaren Flint, appeals by leave granted the order denying in part its motion for summary disposition under MCR 2.116(C)(10) in this action in which plaintiff, Stephanie Britt, alleged weight discrimination and retaliation under the Elliott-Larsen Civil Rights Act (ELCRA), MCL 37.2101 *et seq*. Plaintiff cross-appeals that part of the same order partially granting summary disposition in defendant's favor under MCR 2.116(C)(7). We affirm in part, reverse in part, and remand for entry of an order granting summary disposition of Counts II and III in favor of defendant.

## I. FACTS AND PROCEDURAL HISTORY

Plaintiff worked for defendant as a unit clerk from December 27, 1999, until her discharge on March 1, 2016. In May 2014, she transferred to the surgical services department's preop services, in October 2014 she transferred to the surgical services department's PACU, and in December 2015 she transferred back to preop services. From May 2014 until July 2017 plaintiff was supervised by Lori Peters. When Peters left defendant's employ, Jamie Messer became plaintiff's supervisor in July 2017. Plaintiff had a history of violating defendant's attendance and punctuality policy, resulting in disciplinary action under defendant's corrective action policy, which is a progressive discipline policy with four steps: verbal warning, written warning, suspension, and termination. Major infractions are exempted from the progressive discipline policy and can result in immediate termination. On February 23, 2016, plaintiff was suspended for canceling a patient's surgery and accessing patient information for her own personal use. After an investigation, defendant terminated plaintiff's employment on March 1, 2016. Plaintiff grieved

the discharge and the matter proceeded to arbitration with plaintiff's union representing her. The arbitrator concluded that neither of plaintiff's infractions constituted a major infraction warranting immediate action rather than discipline through the corrective action policy. The arbitrator concluded that plaintiff should be reinstated. The arbitrator rejected plaintiff's claim that defendant had engaged in an unfair labor practice by discharging her because she was a union steward and engaged in union activities.

When plaintiff returned to work in October 2016, she was specifically instructed that lunch breaks were 30 minutes, including leaving and returning to the unit, and that "undergarments worn with scrubs should not hang loose out-side [sic] the scrubs." Plaintiff's tardies and unplanned absences continued. On January 31, 2017, plaintiff received a verbal warning because she had been tardy on December 6 and 8, 2016, and on January 10, 13, and 18, 2017. On February 6, 2017, plaintiff received a written warning because she incurred additional tardies on January 30, 2017, and February 1 and 3, 2017. On June 6, 2017, plaintiff received a "working suspension" because she incurred additional tardies on February 27, 2017, and May 15, 2017. At a disciplinary meeting with respect to the working suspension, Stacey Vanucci, defendant's senior human resources consultant, told plaintiff "where she was at, that she was at the last level, one more occurrence she would be at the termination level. I wanted to make it perfectly clear during that meeting that she was aware of that." On September 6, 2017, defendant terminated plaintiff's employment because she incurred another tardy on August 25, 2017. Plaintiff refused to sign the corrective action form, but wrote on the form that there were discrepancies with the time clocks in the hospital. Although not the reason for her discharge, plaintiff also incurred 20 unplanned absences since she returned to work in October 2016.[1] Plaintiff filed a grievance with the union, which declined to arbitrate the matter.

Meanwhile, on December 1, 2016, plaintiff filed a charge of discrimination with the Michigan Department of Civil Rights (MDCR). Plaintiff listed the cause of discrimination as "retaliation, race, weight" and indicated that the discrimination occurred on October 18 and 20, 2016. Plaintiff alleged that she received a written warning on October 18, 2016, for being absent on six occasions within the previous year. She claimed that she had been absent only three times within the previous year and that she was disciplined because she previously filed a civil rights complaint against defendant on June 6, 2016. Plaintiff also claimed that she had been called to the HR office three times since returning to work in October 2016. She claimed that during the first incident she was advised that she was not permitted to wear long sleeved shirts under her scrubs. She maintained that "everyone" wore long sleeves in cold weather. Plaintiff claimed that during the second incident she received a write-up regarding her absences. Plaintiff claimed that during the third incident she was chastised for taking an extended break. She maintained that she was being subjected to such treatment because she engaged in protected activity. Plaintiff did not make any allegations regarding race or weight discrimination.

Defendant's representative, Janet Borgerding, responded to the charge and said that plaintiff had been disciplined in accordance with defendant's attendance and punctuality policy,

---

[1] Plaintiff maintained that FMLA (Family Medical Leave Act) would be "covering" some of her absences because of her father's illness.

which provided that employees would receive a written warning if they incurred six unplanned absences within a rolling 12-month period. Borgerding also said that plaintiff tended to wear "whatever she wanted under and over her scrubs," which necessitated conversations regarding her clothing. Borgerding stated that no employees working in the surgical services unit were permitted to wear long sleeves.

The MDCR determined that there was no causal connection between plaintiff's discipline regarding her absences and her protected activity. The MDCR stated that plaintiff had been disciplined in accordance with defendant's policy regarding unexcused absences. The MDCR noted that defendant had provided documentation regarding two other surgical services employees who had been disciplined in a similar manner. The MDCR concluded that defendant would have taken the same action regardless of plaintiff's involvement in protected activity. Regarding plaintiff's attire, the MDCR stated that there were no other employees who were similarly situated and reported to the same supervisor. The MDCR dismissed the complaint.

Plaintiff filed this action on August 21, 2017, alleging weight discrimination with respect to her March 2016 discharge (Count I). Following her September 2017 discharge, she amended her complaint to add weight discrimination (Count II) and retaliation (Count III) claims regarding that discharge. Plaintiff's weight discrimination claims are based on her allegation that Lori Peters, plaintiff's supervisor from May 2014 to May 2017, repeatedly criticized her because of her weight. In July 2017, Jamie Messer became plaintiff's supervisor and was plaintiff's direct supervisor at the time of her September 2017 discharge. Plaintiff's retaliation claim is based on her allegation that her December 1, 2016 charge of discrimination with the MDCR was a substantial factor in defendant's decision to discharge her in September 2017.

Plaintiff testified at her deposition that she is morbidly obese. She said that most of the 55 people who reported to Peters "picked on her" and complained to Peters about her. Peters investigated each complaint. Plaintiff testified that she was in the HR office several times each week responding to complaints made against her by coworkers. On one occasion, a nurse complained that plaintiff was wearing ripped scrubs to work. Plaintiff told Peters that the chairs in the department were old and that the metal on the sides of the chairs would rip her scrubs. Peters arranged for new chairs for the department and, according to plaintiff, she was provided a chair designed for a 600-pound bariatric person. Plaintiff said that she had heard through others that Peters told them that plaintiff's chair cost $1,000 and "blew the budget." Peters also ordered special scrubs for plaintiff in a size 7X. Plaintiff testified that Peters had previously complained about plaintiff wearing clothing that hung outside of her scrubs and that when giving plaintiff the new scrubs told her that she should not have a problem with the scrubs fitting properly. Plaintiff stated that Peters continually harassed her about her weight. She said that she and Peters discussed bariatric surgery and dieting and that Peters told her that she was 100 pounds overweight and had "kids to live for." She said that when a coworker, who was overweight, told plaintiff and Peters that she had joined a fitness class and was losing weight, and told plaintiff that she could lose her

"abdominal apron"[2] if she joined the class, Peters did not intervene. Plaintiff felt that Peters was being mean to her because of her weight.

Plaintiff testified that, on her last day of employment, August 25, 2017, someone else let her in because her badge had not been reactivated after she had taken FMLA time. She testified that her shift began at 5:00 a.m. and that she was in the elevator at approximately 4:45 a.m. She maintained that she set up her workstation and logged in on her computer before she clocked in that day. She stated that "Pam" told her to clock in because it was almost 5:00 a.m., but that, when she went to the time clock, it showed 5:03 a.m. She told Messer that she clocked in late but that she had been there by 5:00 a.m.

Messer testified that she was unaware that plaintiff had filed a complaint with the MDCR. She said that on August 25, 2017, plaintiff approached her and informed her that she had been late. Messer asked plaintiff why she was late, and plaintiff responded that she was with "Maryanne" and that Maryanne ran for the time clock to clock in on time, but plaintiff stated, "I'm not running." Messer testified that plaintiff said she was not running in a "joking" manner. Thereafter, Bardell, the department manager, notified Messer that plaintiff's August 25, 2017 tardy put her at the next disciplinary step, which was termination.

Peters testified that she and plaintiff discussed plaintiff's weight when plaintiff told her that her scrubs did not fit. Peters said that plaintiff told her that she was trying to lose weight by drinking ionic water. Peters stated that she and plaintiff then purchased ionic water together. Peters said that she was overweight at five-foot-six-inches and 361 pounds. Peters recalled one conversation during which Peters informed plaintiff that she needed to return from lunch on time. Plaintiff responded that she should be provided extra time because of her weight. Peters also testified that she discussed with plaintiff the fact that her clothes were "messy and dirty," which was when plaintiff told her that her scrubs did not fit and Peters ordered her five pairs of size 7X scrubs. Peters said that she ordered plaintiff a bariatric chair because plaintiff was uncomfortable in her chair. Peters denied telling others the cost of the chair and testified that she did not know the cost of the chair. Peters testified that she talked to plaintiff about her timeliness and that plaintiff had a habit of not punching in if she was late or punching in late. Peters said that plaintiff often wore "a negligée" that hung to her knees under her scrubs, in violation of defendant's attire policy, which resulted in a verbal warning from Peters and Bardell. Peters also testified that plaintiff sometimes appeared for work in dirty scrubs. Peters stated that the hospital could not put plaintiff's scrubs in the hospital laundry because they had to be special ordered from a different company than provided other employees' scrubs. The company that provided other employees' scrubs would not launder scrubs from a different company. Therefore, plaintiff was permitted to launder her scrubs at home.

Peters testified that another employee wore an inappropriate shirt under her scrubs, and she directed the employee to remove it. Peters denied suggesting that plaintiff lose weight or undergo bariatric surgery. Peters recalled that plaintiff asked for additional time during lunch because she

---

[2] Plaintiff said that she was told by the nurse that an abdominal apron is the fat covering the lower abdomen.

weighed more than other employees and took longer to walk through the hospital. Peters said that she had no criticisms of plaintiff because of her weight. She said that she never disciplined plaintiff because of her weight and was unaware until the arbitration with respect to plaintiff's June 6, 2016 charge of discrimination that plaintiff was complaining about discrimination because of her weight. Peters was not employed by defendant at the time of plaintiff's termination and was not involved in the decision to terminate plaintiff's employment.

Defendant moved for summary disposition of Count I under MCR 2.116(C)(7), asserting that plaintiff's claim for weight discrimination related to her March 2016 discharge was barred by a contractual period of limitations. Defendant also asserted that plaintiff had no damages related to her March 2016 discharge because she had been reinstated and "made whole." Defendant moved for summary disposition of Counts II and III under MCR 2.1167(C)(10). Regarding Court II, defendant asserted that plaintiff had failed to establish a prima facie case for weight discrimination related to her September 2017 discharge, and that defendant had provided a legitimate, nondiscriminatory reason for discharging plaintiff, which reason plaintiff could not establish was pretextual. Regarding Count III, defendant asserted that plaintiff had failed to establish a prima facie case for retaliation and that plaintiff could not establish a causal connection between her December 2016 MDCR charge and her September 2017 discharge.

The trial court granted defendant's motion with respect to Count I, finding that the contractual limitations period was reasonable and that plaintiff's claim of weight discrimination with respect to her March 2016 discharge was barred. The trial court denied defendant's motion with respect to Count II, finding that plaintiff presented a prima facie case of weight discrimination, that defendant had provided a legitimate, nondiscriminatory reason for discharging plaintiff, and that plaintiff had shown sufficient disputed facts regarding whether the stated reason was merely a pretext for weight discrimination. The trial court also denied defendant's motion with respect to Count III, finding a genuine issue of material fact regarding a causal connection between plaintiff's MDCR complaint and defendant's decision to discharge her.

## II. STANDARD OF REVIEW

This Court reviews de novo a trial court's decision on a motion for summary disposition. *El-Khalil v Oakwood Healthcare, Inc*, 504 Mich 152, 159; 934 NW2d 665 (2019). "In reviewing a motion for summary disposition under MCR 2.116(C)(7), a court considers the affidavits, pleadings, and other documentary evidence presented by the parties and accepts the plaintiff's well-pleaded allegations as true, except those contradicted by documentary evidence." *McLean v Dearborn*, 302 Mich App 68, 73; 836 NW2d 916 (2013). A summary disposition motion brought under subrule (C)(7) "does not test the merits of a claim but rather certain defenses," such as prior judgment or statute of limitations, that may eliminate the need for a trial. *Nash v Duncan Park Comm*, 304 Mich App 599, 630; 848 NW2d 435 (2014), judgment vacated in part 497 Mich 1016 (2014).

Summary disposition under MCR 2.116(C)(10) is appropriate where, "[e]xcept as to the amount of damages, there is no genuine issue as to any material fact, and the moving party is entitled to judgment or partial judgment as a matter of law." In reviewing the motion, this Court considers the "pleadings, admissions, and other evidence submitted by the parties in the light most favorable to the nonmoving party." *Piccione v Gillette*, 327 Mich App 16, 19; 932 NW2d 197

(2019) (quotation marks and citation omitted). The moving party has the initial burden of production, and may satisfy that burden by either submitting "affirmative evidence that negates an essential element of the nonmoving party's claim," or by demonstrating "that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim." *Quinto v Cross & Peters Co*, 451 Mich 358, 362; 547 NW2d 314 (1996). When a motion under subrule (C)(10) is made and supported as provided in the rule, an adverse party may not rest upon the mere allegations or denials of his or her pleading, but must, by affidavits or as otherwise provided in the rule, set forth specific facts showing that there is a genuine issue for trial; if the adverse party does not so respond, judgment, if appropriate, shall be entered against him or her. MCR 2.116(G)(4). "A genuine issue of material fact exists when the record leaves open an issue upon which reasonable minds might differ." *Johnson v VanderKooi*, 502 Mich 751, 761; 918 NW2d 785 (2018) (quotation marks, citation, and brackets omitted).

Questions of contract interpretation are also reviewed de novo. *Kloian v Domino's Pizza LLC*, 273 Mich App 449, 452; 733 NW2d 766 (2006).

## III. CONTRACTUAL PERIOD OF LIMITATION

With respect to Count I of plaintiff's complaint, plaintiff argues in her cross-appeal that the trial court erred by granting defendant summary disposition to defendant in relation to her March 1, 2016 discharge. We disagree.

Defendant moved for summary disposition on the ground that the claim was barred by the period of limitations contained in the acknowledgment of conditions provision of the candidate assessment form that plaintiff electronically signed when applying for the position from which she was discharged. Paragraph 4 of the acknowledgment of conditions stated:

In consideration of McLaren's review of my application, I agree that any lawsuit or state administrative claim arising out of my employment, my application for employment, or the termination of my employment with McLaren or any of its subsidiaries must be filed no more than six (6) months after the date of the employment action that is the subject of this lawsuit or claim. I waive any statute of limitations to the contrary. Should a court determine that this period of time is unreasonable, the court shall enforce this provision as far as possible and shall declare the lawsuit or claim barred unless it was brought within the reasonable time within which it should have been commenced.

Defendant produced the candidate assessment form and the most current acknowledgment of conditions signed by plaintiff on March 16, 2017. Rachelle Hulett, defendant's vice-president of HR, stated in her affidavit that defendant stopped using paper applications in March 2011, so individuals who wished to apply for a position would submit the electronic candidate assessment form that contained the acknowledgment of conditions. (*Id.*) Hulett said that the contractual limitations period language in paragraph 4 of the acknowledgment of conditions is a standard part of defendant's electronic employment application and has been since defendant began using the electronic method. In other words, the form's content with respect to the six-month deadline in which to file a lawsuit had not changed. An applicant cannot update their candidate assessment form without electronically signing the acknowledgment of conditions. Hulett said that plaintiff

applied for 279 positions between March 29, 2011 and 2018. Plaintiff had to electronically sign the acknowledgment of conditions in order to submit the candidate assessment form. Hulett said that when an applicant updates their candidate assessment form and electronically signs the acknowledgment of conditions, any former electronic signature is overwritten in defendant's applicant tracking system by the new signature. Consequently, defendant did not have a copy of every acknowledgment of conditions that plaintiff signed. Hulett said that defendant reviewed plaintiff's candidate assessment form on numerous occasions, including her April 12, 2014 form, which resulted in plaintiff's initial transfer to the position in the surgical services preop, and her November 6, 2015 form, which resulted in her transfer back to the surgical services preop, which was the position from which she was discharged on March 1, 2016.

Defendant argued that plaintiff's claim with respect to her March 1, 2016 discharge was barred by the contractual period of limitations because it was not filed within six months of her discharge. Plaintiff's counsel argued that defendant failed to produce the acknowledgment of conditions signed by plaintiff when she was hired for the position from which she was terminated on March 1, 2016, and that defendant had "no reasonable excuse for the . . . failure to produce the document." However, Hulett explained that the system would overwrite the previous form each time a candidate submitted a new application and signed a new acknowledgment of conditions form. Plaintiff produced no evidence to refute defendant's explanation, nor did she produce any evidence to raise a material question of fact with respect to whether the acknowledgment of conditions form she electronically signed when she submitted the November 15, 2015 candidate assessment form for the position she held at the time of her March 1, 2016 discharge differed from the acknowledgment of conditions form she electronically signed on May 16, 2017. Instead, she argued that the court should not consider the May 16, 2017 acknowledgment of conditions because of "spoliation of evidence." She claimed that it was for a jury to decide whether "overwriting" and updating an electronically signed form is a "reasonable excuse" for failure to produce the actual form signed by plaintiff at the time of her application. In response, defendant's counsel noted that plaintiff testified in her deposition she applied for positions using the electronic candidate assessment form and that she signed the acknowledgment of conditions when she submitted candidate assessment forms.

Defendant presented unrefuted evidence that plaintiff electronically signed the acknowledgment of conditions form when she submitted her candidate assessment on November 6, 2015, which resulted in her being hired for the position from which she was discharged on March 1, 2016, and that the relevant portion of the claims limitation remained the same on latter versions signed by plaintiff. Reasonable jurors could not disagree that defendant had a reasonable excuse for failing to produce the November 6, 2015 electronic form under the circumstances of plaintiff's multiple applications and the electronic application system's design. Plaintiff had until September 1, 2016—six months from the date her employment was terminated—in which to file a lawsuit arising out of her March 1, 2016 discharge. Plaintiff did not file her lawsuit until August

21, 2017. Consequently, her claim of weight discrimination arising from her March 1, 2016 discharge was time-barred.[3]

## IV. WEIGHT DISCRIMINATION

Defendant argues on appeal that the trial court erred by denying its motion for summary disposition of plaintiff's claim in Count II of her complaint for weight discrimination arising out of her September 2017 discharge. Defendant contends that plaintiff failed to offer sufficient direct or circumstantial evidence to create a genuine issue of material fact regarding whether her discharge was causally related to her weight, and she failed to offer sufficient evidence of whether defendant's proffered reasons for her discharge were pretextual. We agree.

MCL 37.2202(1)(a) states:

> (1) An employer shall not do any of the following:
> (a) Fail or refuse to hire or recruit, discharge, or otherwise discriminate against an individual with respect to employment, compensation, or a term, condition, or privilege of employment, because of religion, race, color, national origin, age, sex, height, weight, or marital status.

A plaintiff asserting discrimination under MCL 37.2202(1)(a) may show discrimination through (1) direct evidence or (2) indirect evidence under the *McDonnell Douglas*[4] framework. *Hazle v Ford Motor C*o, 464 Mich 456, 462; 628 NW2d 515 (2001).

## A. DIRECT EVIDENCE

"Under the direct evidence test, a plaintiff must present direct proof that the discriminatory animus was causally related to the adverse employment decision." *Sniecinski v Blue Cross & Blue Shield of Mich*, 469 Mich 124, 135; 666 NW2d 186 (2003). Direct evidence of discrimination is evidence that, if believed, requires the conclusion that discrimination was at least a motivating factor in the employer's decision. *Id*. at 133. "In a direct evidence case involving mixed motives, i.e., where the adverse employment decision could have been based on both legitimate and legally impermissible reasons, a plaintiff must prove that the defendant's discriminatory animus was more likely than not a substantial or motivating factor in the decision." *Id*.(quotation marks and citation omitted). A plaintiff must also "present direct proof that the discriminatory animus was causally related to the adverse decision." *Id*. "Stated another way, a defendant may avoid a finding of liability by proving that it would have made the same decision even if the impermissible consideration had not played a role in its decision." *Id*.

---

[3] The trial court granted summary disposition to defendant because it determined that plaintiff had 14 months after being discharged and before she signed a new acknowledgment of conditions form to file her lawsuit, and she did not do so.

[4] *McDonnell Douglas Corp v Green*, 411 US 792; 93 S Ct 1817; 36 L Ed 2d 668 (1973).

In her response to defendant's motion for summary disposition, plaintiff asserted that her direct evidence consisted of Peters's alleged weight-related comments and conduct when she supervised plaintiff. Derogatory remarks may constitute direct evidence, provided that the remarks "display, on their face, hostility toward a group" and the remarks "reasonably may be considered as indicating a likelihood that the speaker would discriminate against the targets of the remarks." *Lamoria v Health Care & Ret Corp*, 230 Mich App 801, 810 n 8; 584 NW2d 589 (1998), reasoning adopted by special panel, 233 Mich App 560; 593 NW2d 699 (1999). For example, with regard to weight in particular, all references to weight or weight loss are not necessarily an indication of hostility or evidence that the speaker would be likely to discriminate against an individual on the basis of weight. See *id*.

> [W]eight is an aspect of oneself that is subject to some control by one's conduct. It is common knowledge that many health professionals advise against being "overweight." Accordingly, comments that could be reasonably taken as mere advice about diets and the like do not amount to expressions of animus sufficient to indicate a likelihood that one would engage in illegal weight discrimination. [*Id*.]

Further, "stray" remarks are typically not direct evidence of discrimination. See *Sniecinski*, 469 Mich at 135.

> Factors to consider in assessing whether statements are "stray remarks" include: (1) whether they were made by a decision maker or an agent within the scope of his employment, (2) whether they were related to the decision-making process, (3) whether they were vague and ambiguous or clearly reflective of discriminatory bias, (4) whether they were isolated or part of a pattern of biased comments, and (5) whether they were made close in time to the adverse employment decision. [*Sniecinski*, 469 Mich at 136 n 8; see also *Krohn v Sedgwick James of Mich, Inc*, 244 Mich App 289, 292, 300; 624 NW2d 212 (2001).]

In this case, viewing the evidence in a light most favorable to plaintiff, plaintiff failed to present direct evidence of discrimination.

First, the alleged statements and actions did not occur around the time of plaintiff's September 2017 discharge, and Peters was not involved in the decision to discharge plaintiff. In fact, Peters was not even employed by defendant at the time of plaintiff's discharge, as she had left months earlier. Second, plaintiff's characterization of several of the alleged instances is not supported by the evidence in context. Plaintiff claimed that Peters called her into her office three to four times a week to talk about her weight. However, plaintiff testified that she was called in to Peters's office several times a week "responding to complaints made against her by co-workers." Plaintiff claimed that Peters purchased a chair designed for a 600-pound person though plaintiff did not ask for a chair. However, plaintiff testified that Peters purchased the new chair after a coworker complained about plaintiff wearing ripped scrubs at work and plaintiff told Peters that the exposed metal on her broken chair was ripping her scrubs. Plaintiff also claimed that Peters bought her new scrubs in size 7X though plaintiff did not ask for new scrubs. However, plaintiff testified that her scrubs were old and that they were ripped, and she has not alleged that the scrubs purchased after she discussed the scrubs with Peters did not fit her. Plaintiff also claimed that Peters criticized her for wearing oversized shirts beneath her scrubs, even though the long shirts

were necessary to "cover her backside." However, plaintiff did not dispute that the attire policy did not allow clothing to show outside the scrubs.[5] Further, she testified that she wore the oversized shirts to cover the rips in her scrubs, and that because her scrubs had a drawstring waist, they tended to pull down in the back and needed to be covered. Plaintiff notes that Peters told her that her compliance with the attire policy should not be an issue because she was being provided with scrubs that would fit her. Plaintiff's subjective interpretation of Peters's actions does not transfer the actions into direct evidence of discriminatory animus based on weight. Peters's alleged urging that plaintiff diet or undergo bariatric surgery, and her comments that plaintiff "had kids to live for" and was "over 100 pounds overweight," cannot reasonably be taken as an expression of animus sufficient to indicate a likelihood that Peters would engage in illegal weight discrimination, particularly where it appears that the comments were made in the context of general discussion among plaintiff and Peters, who was also overweight, about diet and exercise.

Further, there is no causal connection between any of Peters's comments and actions and defendant's decision to terminate plaintiff's employment in September 2017. See *Sniecinski*, 469 Mich at 135. Even if Peters routinely talked about weight and even if some of the remarks appear insensitive, none of the remarks suggest that Peters would terminate, or otherwise illegally discriminate, against an individual based on weight. The evidence showed that the remarks in question occurred over the course of three years and that plaintiff continued to be employed while she was overweight. The evidence also showed that Peters was not involved in the decision to discharge plaintiff and was not even employed by defendant at the time of plaintiff's discharge. Reasonable minds could not view Peters's comments and actions as causally related to defendant's decision to discharge plaintiff in September 2017. Even if a jury believed that Peters made the statements identified by plaintiff and engaged in the conduct alleged, these statements and actions do not require the conclusion that unlawful discrimination based on plaintiff's weight was at least a motivating factor in defendant's decision to discharge plaintiff. *Hazle*, 464 Mich at 462. Thus, plaintiff did not present direct evidence to merit a trial.

## B. INDIRECT EVIDENCE

In cases involving indirect, or circumstantial, evidence of discrimination, the *McDonnell Douglas* burden-shifting framework applies. *Sniecinski*, 469 Mich at 133-134. That approach "allows a plaintiff to present a rebuttable prima facie case of the basis of proofs from which a factfinder could *infer* that the plaintiff was the victim of unlawful discrimination." *Id*. at 134 (quotation marks and citation omitted; emphasis in original). To establish a prima facie case of discrimination, plaintiff must show that (1) she was a member of the protected class; (2) she suffered an adverse employment action, such as discharge; (3) she was qualified for the position; but (4) she was discharged under circumstances that give rise to an inference of unlawful discrimination. *Lytle v Malady (On Rehearing)*, 458 Mich 153, 172-173; 579 NW2d 906 (1998).

---

[5] Defendant's "Protocol for Proper Operating Room/PACU/Anesthesia/CPD/Endo Attire" policy provides, in relevant part, that "[a]ll personal clothing should be completely covered by the surgical attire. Undergarments such as T-shirts with a V-neck, which can be contained underneath the scrub top, may be worn; personal clothing that extends above the scrub top neckline or below the sleeve of the scrub should not be worn."

"When the plaintiff has sufficiently established a prima facie case, a presumption of discrimination arises." *Hazle*, 464 Mich at 463 (quotation marks and citation omitted). The defendant then "has the opportunity to articulate a legitimate, nondiscriminatory reason for its employment decision in an effort to rebut the presumption created by the plaintiff's prima facie case." *Id*. at 464. "If a defendant produces such evidence, the presumption is rebutted, and the burden shifts back to the plaintiff to show that the defendant's reasons were not the true reasons, but a mere pretext for discrimination." *Sniecinski*, 469 Mich at 134. At the summary disposition stage, "a plaintiff need only create a question of material fact upon which reasonable minds could differ regarding whether discrimination was a motivating factor in the employer's decision." *Hazle*, 464 Mich at 466.

Defendant does not dispute that, as an overweight individual, plaintiff is a member of a protected class, nor does it dispute that she suffered an adverse employment decision when her employment was terminated. See MCL 37.2202(1)(a). Thus, plaintiff established the first two elements of a prima facie case of discrimination. Although defendant disputed whether plaintiff was qualified for the position given her history of unexcused absences and tardies, on appeal defendant focuses on the fourth element—whether plaintiff was discharged under circumstances giving rise to an inference of unlawful discrimination. To establish an inference of unlawful discrimination, plaintiff must present evidence that the employer's actions, if unexplained, "are more likely than not based on the consideration of impermissible factors." *Hazle*, 464 Mich at 470-471.

Plaintiff alleged in her complaint that she was subjected to negative comments about her weight. In her response to defendant's motion for summary disposition, plaintiff alleged that she could create an issue of fact with respect to an inference of unlawful discrimination (1) by showing that she was replaced by an individual outside the protected class, (2) by showing that she was treated less favorably than similarly situated individuals outside her protected class, or (3) through Peters's statements.

First, plaintiff maintained that she was replaced by Tracy Jackson, "an individual much less heavy than plaintiff." Plaintiff did not provide any evidence in support of this statement. However, during her deposition, plaintiff testified that Jackson was overweight "by BMI standards." Consequently, plaintiff failed to provide evidence that she was replaced by an individual outside the protected class. Second, plaintiff alleged that she was treated less favorably than numerous women supervised by Peters who were subject to the same attire policy as plaintiff but were allowed to "[violate the attire policy] without repercussion." Plaintiff was not discharged, however, because of her violation of the dress code. She was discharged because of her violation of the attendance and punctuality policy for tardiness. She did not point to any similarly situated employees outside of her protected class who were not disciplined under the corrective action policy for tardiness. Defendant presented evidence that other individuals were disciplined for similar tardiness of one to three minutes in accordance with the corrective action policy. Third, plaintiff alleged that Peters's comments and conduct created an inference of weight discrimination. As previously discussed, several of the comments and conduct were not supported by the evidence, and several of the comments, including those related to attire in violation of the attire policy, were unrelated to weight. The remaining weight-related comments made by Peters, who herself was overweight—those related to diets, being overweight, and bariatric surgery—even if otherwise unexplained, would not permit a jury to infer unlawful discrimination by defendant.

-11-

Assuming that plaintiff presented evidence to establish a prima facie case of unlawful discrimination based on weight, the burden shifts to defendants to articulate a legitimate, nondiscriminatory reason for their employment decision.  .  Defendant offered documentary evidence to support its proffered justification for defendant's decision—plaintiff's repeated violation of defendant's attendance and punctuality policy.  Defendant made a sufficient showing that it had a legitimate, nondiscriminatory reason for terminating plaintiff's employment.

Given defendant's legitimate, nondiscriminatory reason for terminating plaintiff's employment, the question becomes whether, viewing the evidence in a light most favorable to plaintiff and drawing any reasonable inferences in her favor, plaintiff created a triable issue for the jury concerning whether defendant's legitimate, nondiscriminatory reason for terminating plaintiff's employment plaintiff was pretextual and that weight was, in fact, a motivating factor in defendant's employment decision.  *Hazel*, 464 Mich at 473-474.

Plaintiff asserts that her violation of the attendance and punctuality policy was a mere pretext because her final tardy was "trivial."

> There are three ways a plaintiff can establish that a defendant's stated legitimate, nondiscriminatory reasons are pretextual: (1) by showing the reasons had no basis in fact, (2) if they have a basis in fact, by showing that they were not the actual factors motivating the decision, or (3) if they were factors, by showing that they were jointly insufficient to justify the decision.  The soundness of an employer's business judgment, however, may not be questioned as a means of showing pretext. [*Dubey v Stroh Brewery Co*, 185 Mich App 561, 565-566; 462 NW2d 758 (1990).]

Here, the documentary evidence established that defendant had a basis in fact for terminating plaintiff's employment.  Given the undisputed record evidence of plaintiff's violation of the attendance and punctuality policy, plaintiff could not show that tardiness was not an actual factor motivating the decision to discharge her.  Although plaintiff again relies on Peters's comments and conduct, there is no evidence that Peters, who no longer worked for defendant at the time of plaintiff's 2017 discharge, had any role in defendant's decision to terminate plaintiff's employment. Plaintiff also could not show that her tardiness was insufficient to justify the decision pursuant to the neutral operation of the corrective action program policy.  At most, plaintiff is raising questions about the soundness of defendant's business judgment and that is insufficient to show a genuine issue of fact regarding pretext.  *Dubey*, 185 Mich App at 566.  Because plaintiff has failed to create a genuine issue of material fact concerning pretext, defendant was entitled to summary disposition of the weight discrimination claim.[6]

---

[6] In light of our conclusion, we need not address defendant's argument that the trial court erred by failing to make a finding under MCR 2.116(C)(J) that plaintiff's damages were barred as of November 2017 when she received an offer of employment and that she was not entitled to back pay for the two months that she was unable to work following her discharge.

## V. RETALIATION

Defendant claims that the trial court erred by denying its motion for summary disposition of plaintiff's claim of retaliation in Count III of her complaint because plaintiff failed to establish a material question of fact with respect to a causal connection between her termination and the protected activity. We agree.

MCL 37.2701 of the ELCRA provides:

Two or more persons shall not conspire to, or a person shall not:

(a) Retaliate or discriminate against a person because the person has opposed a violation of this act, or because the person has made a charge, filed a complaint, testified, assisted, or participated in an investigation, proceeding, or hearing under this act.

In order to establish a prima facie retaliation claim, a plaintiff must show:

(1) that [s]he engaged in a protected activity; (2) that this was known by the defendant; (3) that the defendant took an employment action adverse to the plaintiff; and (4) that there was a causal connection between the protected activity and the adverse employment action. [*Garg v Macomb Co Community Mental Health Servs*, 472 Mich 263, 273; 696 NW2d 646 (2005), quoting *DeFlaviis v Lord & Taylor, Inc,* 223 Mich App 432, 436; 566 NW2d 661 (1997).]

The issue here is causation, i.e., whether there was a causal connection between the protected activity—plaintiff's complaint to the MDCR of discrimination—and the alleged adverse employment action—termination. "To establish a causal connection, a plaintiff must demonstrate that his participation in the protected activity was a 'significant factor' in the employer's adverse employment action, not merely that there was a causal link between the two events." *Aho v Dep't of Corrections*, 263 Mich App 281, 289; 688 NW2d 104 (2004). "Thus, mere discriminatory or adverse action will not suffice as evidence of retaliation unless the plaintiff demonstrates a clear nexus between such action and the protected activity." *Id*. "A causal connection can be established through circumstantial evidence, such as close temporal proximity between the protected activity and adverse actions, as long as the evidence would enable a reasonable factfinder to infer that an action had a discriminatory or retaliatory basis." *Rymal v Baergen*, 262 Mich App 274, 303; 686 NW2d 241 (2004).

Plaintiff's December 1, 2016 MDCR complaint listed "retaliation, race, weight" as the alleged cause of the discrimination, but her complaint contained no allegations or alleged instances of discrimination based on weight. Rather, plaintiff specifically alleged that she had been disciplined because she filed a civil rights complaint on June 1, 2016. Defendant responded that plaintiff had been disciplined in accordance with its attendance and punctuality policy regarding unscheduled absences. The MDCR investigation resulted in the following determination:

4. Causal connection between protected activity and adverse action.

Respondent has a specific corrective action policy with regard to attendance that dictates how disciplines are issued (ex[hibits]. Rl, R3, D2, and D3). Claimant was disciplined based upon her number of unexcused absences in accordance with Respondent's policy (ex. Rl, R3, D2, and D3). While Claimant was disciplined within a short timeframe of her protected activity, Respondent's policies legitimize and support the actions taken.

Additionally, Respondent was able to provide documentation of two other Surgical Services employees (who never participated in a protected activity) that received disciplines for violations of the attendance policy as well (ex. R7).

Conclusion: There is no causal connection between Claimant's protected activity and the adverse action.

Plaintiff alleged that she was subject to increased discipline after the above decision. Assuming for the sake of argument that plaintiff presented a prima facie case of retaliation, defendant provided ample evidence that its decision to discharge plaintiff was predicated on plaintiff's violation of the attendance and punctuality policy. Stated otherwise, defendant articulated a legitimate, nonretaliatory reason for its decision and supported that reason with evidence. Plaintiff points to the same evidence she relied on with respect to her September 2017 weight discrimination claim as evidence of retaliation and pretext. This evidence does not reflect that retaliation was a motivating factor for defendant's decision to terminate plaintiff's employment. And Messer, who terminated plaintiff, testified that she was not aware plaintiff had filed a complaint with the MDCR. Thus, plaintiff failed to create a genuine issue of material fact with respect to whether her filing of the December 1, 2016 charge of discrimination was a significant factor in defendant's decision to terminate plaintiff's employment. The trial court erred by denying defendant's motion for summary disposition of plaintiff's claim of retaliation.

We affirm the trial court's grant of summary disposition of Count I in favor of defendant. We reverse the trial court's denial of defendant's motion for summary disposition of Counts II and III and remand for entry of an order granting summary disposition of Counts II and III in favor of defendant. We do not retain jurisdiction.

/s/ Patrick M. Meter
/s/ Jane M. Beckering
/s/ Colleen A. O'Brien